# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES of AMERICA,

        Plaintiff,

        v.                                         Case No. 07-C-316

MENOMINEE TRIBAL ENTERPRISES,
the principal business arm of the
Menominee Indian Tribe of Wisconsin,
MARSHALL PECORE, and CONRAD WANIGER,

        Defendants.

---

## DECISION AND ORDER

---

This matter is before the Court on the Government's motion for a protective order seeking limitations on further discovery by Defendant Menominee Tribal Enterprises ("MTE") and directing the MTE to remove from its website discovery materials it has or will in the future obtain in the case. Also before the Court is a motion of the Menominee Indian Tribe of Wisconsin ("the Tribe") to quash a subpoena issued by MTE to Lisa S. Waukau, an elected member of the Menominee Tribal Legislature, directing Waukau to appear for a deposition in the matter. The Tribe, which is not a party to the lawsuit, argues that MTE's subpoena of Waukau is barred under the doctrine of tribal immunity because any information she may have on the matter is information she obtained in her official capacity as a member or Chairperson of the Menominee Tribal Legislature. Finally, MTE has filed a motion to compel production of documents from the United States, for an additional seven hours to complete its examination of an individual it views as a key witness against it, and for relief in connection with electronic discovery.

## BACKGROUND

The United States commenced this action against MTE and two of its employees, Marshall Pecore and Conrad Waniger, for violations of the False Claims Act, 31 U.S.C. §§ 3729-33, and breach of contract. MTE, identified in the complaint as the principal business arm of the Tribe, had two contracts with the United States – one requiring MTE to provide road maintenance on reservation roads, and the other to provide fire suppression work in the tribal forest. In 187 paragraphs, the Complaint alleges that MTE, Pecore and Waniger submitted twelve false invoice documents to the Bureau of Indian Affairs (BIA) of the United States Department of the Interior for fire suppression work it did not complete and that MTE breached its BIA contracts by making eight improper expenditures of federal money. The United States seeks damages and penalties totaling approximately $1.3 million for acts, most of which are alleged to have occurred from 1999 to 2002.

MTE has, to put it mildly, responded with an aggressive defense. Characterizing the Government's claims as "perversions of the laws on which they are based [which] can serve only to waste resources of the Government, the Menominees and the Court" (Answer, at 1), MTE has denied the allegations of the Complaint and claims that the Government's case is motivated by a desire to force the Menominee Tribe "to acquiesce in a change in the Forest Manager position, held by Defendant Marshall Pecore . . . since 1976." (Answer ¶ 3.) In addition to its general denial and specific responses to each of the 187 paragraphs of the Complaint, MTE has asserted twenty-one affirmative defenses.

MTE's aggressive defense carried over to its discovery of the Government's case, resulting in what has all the earmarks of abuse of the rules governing discovery in federal cases. Notwithstanding the 11,500 pages of its files the Government turned over, or attempted to turn over,

2

in its initial disclosure pursuant to Rule 26(a)(1)(B) on July 20, 2007, including investigative reports, invoices, maps, photographs, and thousands of pages of internal BIA documents obtained over the course of the investigation, MTE had, within two weeks, served the Government seven demands for discovery, consisting of fifty-two separate document requests and twenty-four interrogatories (not including subparts). Many of the document requests were so broad that to withhold anything falling within the general category described would have risked noncompliance. Others seek documents that are arguably far outside the scope of discovery allowed under Rule 26. (Aff. of Chris R. Larsen ¶¶ 4-7.)

The Government nevertheless sought to respond to MTE's requests and also made available an estimated 80,000 pages of internal BIA files before even completing its privilege review. After five consecutive days of document inspection at which it marked and the Government copied some 1,300 pages at government expense, MTE suspended its inspection. MTE resumed its inspection two months later and by March 5, 2008, was on its sixteenth day of document review, having marked over 25,000 for copying. At that point, the Government informed MTE that it would have a private contractor scan the entire set of records, including the place holders MTE had used to mark the documents it wanted copied, and provide it all to MTE in electronic format at no charge. (Larsen Aff. ¶¶ 8-10, 17-18, 27.)

In the meantime, MTE continued to serve other discovery demands on the Government, and by March 12, 2008, it had served twenty-one sets of demands for discovery upon the Government, including fifteen sets of document requests, altogether containing 166 individual requests for discovery. In addition to its formal demands for discovery, MTE has made hundreds of informal

3

demands (via letter, email, or verbal requests) for internal investigations, additional information, and discovery of government files. (Larsen Aff. ¶¶ 12-16, 19-26.)

At around the same time, the Government learned that MTE was posting discovery materials under the heading "MTE Litigation Library" on its public internet website (www.mtewood.com). In addition to the pleadings, motions, and briefs that have been filed in the case, the website also offers links to the written transcript or digital video recording of various depositions that have been taken in the case. The Litigation Library Outline also contains headings for a "Chronology of Documents" and "David L. Congos Communications to BIA and MTL [Menominee Tribal Legislature]." Although MTE has indicated its intent to make all of the discovery public, no link to these documents presently exists.

Concerned over what it describes as MTE's abuse of the discovery process, including its overly broad and cumulative requests for production of documents, the excessive number of written interrogatories, its extensive questioning of witnesses at depositions on extraneous topics having no relevance to the issues in the case, and fearing that MTE's publication of discovery materials on its website could result in the disclosure of confidential information protected from public disclosure under the Privacy Act, 5 U.S.C. § 552a, or lead to the harassment or intimidation of witnesses, the Government moved for a protective order. The proposed order submitted by the Government prohibited MTE from serving any more written interrogatories on the ground that it had already exceeded the maximum number allowed under Fed. R. Civ. P. 33(a) and Civil L.R. 33.1. The proposed order also prohibited MTE from serving any additional request for production of documents unless such request was accompanied by a written statement setting forth (1) the relevance of the requested material to the claims of the United States or the defenses asserted by

4

MTE; and (2) how the submitted request is not duplicative of prior document requests served by MTE. As to the fifty-one specific outstanding requests contained in MTE's twelfth, thirteenth, fourteenth and fifteenth sets of requests for production of documents, the Government first requested that it be allowed to furnish MTE with an electronic version of all BIA documents that it believes contain the responsive information. The Government also agreed to produce emails sent from the laptop computer of David Congos, a BIA employee MTE views as crucial to its defense, along with the metadata related to a particular memorandum drafted by Congos, assuming it can be found. As to MTE's request for a copy of Congos' personnel file, the Government claimed it contained no discoverable information but offered to produce the file to the Court for in camera review. Finally, the Government requested the Court to designate all documents previously provided, or yet to be provided, by the United States in the course of civil discovery in the action "Protected," and prohibit the disclosure of such documents other than as needed to defend against the claims asserted against the defendants. The Government specifically requested that documents produced in the course of discovery, as well as digital video recordings of depositions taken in the matter be removed from MTE's website.

Upon review of the Government's motion and the Tribe's motion to quash the subpoena issued to Lisa Waukau, the Court entered an interim protective order limiting further discovery by MTE as requested by the Government pending a full hearing on the motion and staying the deposition of Lisa Waukau. The interim order also required MTE to remove from its website all discovery produced by the United States which contains materials subject to protection by the Privacy Act, 5 U.S.C. § 552a, including identifying information such as addresses and social

5

security numbers, medical information, financial information, and employment history. The Court then set the matter for a hearing.

In the meantime, MTE filed its response to both the Government and the Tribe, and then filed its own motion to compel. In response to the Government's motion, MTE denied that its discovery requests were improper or abusive and argued instead that its discovery "has been surgical, strategic, specific, targeted, and guided by the documentary record." (MTE Br. Opp. at 1.) In contrast to its targeted approach, MTE accused the Government of attempting to engage in a "document dump" on MTE by burying it in thousands of pages of documents in response to its requests. (*Id.*) MTE claims that the Government has responded to its requests with many more documents than it asked for in an attempt to bootstrap its way into a protective order. Indeed, MTE claims that it rejected the Government's Rule 26(a)(1) initial disclosure consisting of some 11,500 pages of electronically stored information and instead issued its first sets of document requests. As described by its attorney at the hearing on the several motions before the Court, MTE began its discovery by issuing more general demands and then proceeded to narrow its requests to target specific information it was seeking. Instead of complying with its discovery obligations, MTE claims that Government essentially dumped boxes of documents in a room and required MTE attorneys to spend untold hours reviewing irrelevant and unorganized documents, and marking those it desires for copying by the Government. Now that it has almost completed its review, MTE objects that the Government wants to cut off MTE's review and provide it with a CD containing electronically scanned copies of the Government's entire production. Under these circumstances, MTE argued that the Government's request for limitations on its discovery should be denied.

6

MTE also opposed the Government's request that it be ordered to remove transcripts and video recordings of depositions taken in the case from its website and that it be precluded from placing documents produced during discovery in its online Litigation Library. Citing the strong public policy of openness in the courts and the strong interest among members of the Menominee Tribe in the case, MTE argues it would be improper to in effect seal all discovery produced by the Government without a strong showing of need. Because the Government has failed to make such a showing, MTE claims that its request for an order directing MTE to remove discovery materials from its website should be denied.

Notwithstanding MTE's contention that it had not conducted its discovery in an abusive manner, the Court granted the Government's request for limitations on MTE's future discovery in a ruling from the bench at the hearing held on April 15, 2008. Having reviewed the discovery demands served by MTE and the transcripts of the depositions of two of the witnesses, the Court was at the time and remains satisfied that the requested limitations on future requests by MTE are appropriate and necessary to protect the Government from undue burden and expense. Even accepting MTE's account of its discovery strategy as true, the strategy essentially required the Government to perform multiple reviews of innumerable documents to comply with MTE's continuing requests. By starting with general requests for all possible information that might lead to discoverable information and then serving an ongoing stream of follow-up requests intended to narrowly target more precisely the documents it wants, MTE has been demanding that the Government perform review and assessment tasks that are properly its own. Having once produced all of the documents requested, the Government is not required to undertake further reviews to specifically identify those that might match MTE's new but narrower description. This does not

7

mean that a party should not respond to an opposing party's specific requests for key documents that may be buried in a file. But the record reflects that the Government has gone beyond its duty to comply with reasonable requests for such information. To the extent MTE has further requests for documents, it must comply with the conditions set forth in the Court's interim protective order. And since MTE has not challenged the Government's claim that it has already exceeded the number of written interrogatories allowed under Rule 33(a) and Local L.R. 33.1, the Government's request that it be prohibited from serving any further interrogatories absent leave of the Court will also be granted.

The Court also ruled during the course of the hearing that the Government would be allowed to respond to MTE's outstanding document requests by providing it with electronically scanned copies of the documents, rather than continue to copy only those documents marked for copying by MTE. MTE's concern that the time it has already spent reviewing and marking document would be lost is alleviated by the fact that the Government has agreed to include MTE's markers in the copy it provides. Further, the Government's request that the Court review Congos' personnel file in camera was granted and MTE's request that it be allowed an additional seven hours in which to depose him was denied. As to the latter, noting that counsel for the individual defendants was scheduled to depose Congos within the month and the Government had no objection if MTE used some of the time allowed for that deposition, the Court instructed MTE's attorney to renew his motion in the event he believed more time was needed after the second round of questioning. In the event he does renew his motion, however, counsel should be prepared to be specific in advising the Court what areas have not already been adequately covered and to defend the use of the time already allowed.

8

After entering the foregoing rulings and lifting the stay as to other discovery not at issue, the Court took the remaining matters under advisement. These include the Government's request that MTE be prohibited from disseminating discovery materials acquired in this case to the public via its website, the Tribe's motion to quash MTE's subpoena compelling the deposition of Lisa Waukau, MTE's motion to compel production of BIA invoice policies and procedures applicable to other tribes. This decision will address those matters.

## I. Motion for a Protective Order Preventing MTE's Dissemination of Discovery Materials

The United States has filed a motion for a protective order preventing MTE from disclosing to third parties the materials provided to it by the United States in the course of discovery. Specifically, the United States objects to MTE's dissemination of the material via its website. The website presently contains a page entitled "Litigation Library Outline," which provides links to discovery materials, including video depositions, as well as court orders and pleadings in this case. (See http://www.mtewood.com/WebDocs/Litigation%20Library.htm (last visited Apr. 22, 2008).) The United States seeks a protective order that states "[a]ll documents previously provided, or to be provided in the future, by the United States to the Defendants in the course of civil discovery in this action are designated 'Protected.'" (United States' Proposed Order ¶ 4.) As such, none of the discovery materials could be disclosed to anyone who did not have "duties with respect to this action." (Id. ¶ 5.) The United States would also have the Court require that MTE "immediately remove all discovery, including but not limited to documents produced by the United States and video of any depositions taken, from its website," and refrain from posting "any materials or information obtained through discovery in this matter on its website" in the future. (Id. ¶ 6.)

9

In support of its request for such a broad protective order, the United States relies upon the affidavit of Assistant United States Attorney Christian Larsen, in which he states, "[i]n counsel's experience, the public disclosure and potential further dissemination of discovery materials involving cooperating government witnesses can serve to increase the possibility of retaliatory action, and to dissuade witnesses from testifying at trial in a complete and truthful manner." (Larsen Aff. ¶ 30, Mar. 19, 2008.) According to AUSA Larsen, "during the investigation and prosecution of this matter, certain individuals (whom the United States does not wish to disclose in this unsealed pleading) have expressed a fear of retribution should they cooperate, or continue to cooperate, in the government's investigation." (Id.) The United States also objects to the dissemination of the discovery material because potential jurors might access the information. (United States' Reply Supp. Mot. for Protective Order 5.) MTE, on the other hand, claims that the public, and the members of the Menominee Tribe in particular, have the right to access the material. (MTE's Mem. Opp. Mot. for Protective Order 28.)

Upon a showing of good cause, a district court may enter a protective order prohibiting the public dissemination of information obtained pursuant to the rules governing discovery in a civil proceeding. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37 (1984). Recognizing the opportunity for litigants to obtain—incidentally or purposefully—information that not only is irrelevant but if publicly released could be damaging to reputation and privacy, the *Seattle Times* Court held that "the government clearly has a substantial interest in preventing this sort of abuse of its processes." *Id.* at 35. But the entry of such an order is the exception rather than the rule. "Absent a protective order, parties to a lawsuit may disseminate materials obtained during discovery as they see fit." *Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 858 (7th Cir. 1994); *see also Citizens First*

10

*Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 946 (7th Cir. 1999) (noting that "[m]ost cases endorse a presumption of public access to discovery materials").

Of course, the presumption that discovery materials are open to the public is significantly greater once the material has been made a part of the record in a case before the court. The Seventh Circuit has cautioned in the plainest terms that the default rule is full disclosure, and only in unusual cases may matters submitted in federal courts be shielded from public view.

> What happens in the federal courts is presumptively open to public scrutiny. Judges deliberate in private but issue public decisions after public arguments based on public records. The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat and requires rigorous justification.

*Hicklin Engineering, L.C. v. Bartell,* 439 F.3d 346, 348 (7th Cir. 2006).

The same considerations do not apply, however, to discovery material that has not been made a part of the court record. As the *Seattle Times* Court observed, "[m]uch of the information that surfaces during pretrial discovery may be unrelated, or only tangentially related, to the underlying cause of action. Therefore, restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information." 467 U.S. at 33. Where the parties are in agreement, they can maintain confidentiality over virtually all information exchanged in pretrial discovery that is not made a part of the record before the court. In *Baxter International v. Abbott Laboratories*, 297 F.3d 544, 545 (7th Cir. 2002), for example, the Seventh Circuit distinguished between these two categories of information, noting that confidentiality agreements between parties during discovery may be acceptable, because "secrecy is fine at the discovery stage, before the material enters the judicial record." The Court went on to hold,

11

however, that "those documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality." *Id.*

While this case also involves discovery materials that are not yet part the judicial record, it differs from *Baxter International* in that there was no agreement between the parties to maintain confidentiality regarding discovery materials. Only one of the parties, the Government, wants to prevent public dissemination of the discovery material, and MTE did not agree to maintain confidentiality concerning discovery material before it was produced. Under these circumstances, the presumption that the materials can be disclosed controls unless the Government establishes good cause for the protection it seeks. The showing of good cause needed to prohibit disclosure of discovery materials that have not entered the judicial record is not as great as what is needed to seal the court record after the material has been received. But it requires more than speculation. Good cause, in this context, is established by showing "that disclosure will cause a clearly defined and serious injury." *Felling v. Knight*, 2001 WL 1782360, *2 (S.D. Ind. Dec. 21, 2001) (Tinder, J.).

Even under this lower standard, the Government's showing is insufficient. The Government asserts only generalized concerns in support of its request that MTE be ordered to remove discovery material from its website. For example, it notes that because of the breadth of MTE's discovery demands, the Government has produced a vast amount of material that is irrelevant and unlikely to be admissible at trial. (Reply Br. at 5.) The Government also expresses concern that MTE's website may taint the potential jury pool by making available evidence that will not be admitted at trial. It fears that witnesses who have been previously deposed may be harassed or intimidated as a result of having the video recording of the deposition available for public viewing. (*Id.*) The

12

Government also notes that in its efforts to comply with MTE's discovery requests, it may have inadvertently produced privileged documents, relying on Rule 26's "claw-back" provision, *see* Fed. R. Civ. P. 26(b)(5)(B), to obtain the return of such information later. By placing the discovery it obtains on its website, the Government contends that MTE makes such reliance unreasonable, thereby necessitating a thorough privilege review before responding to discovery requests.

Only as to the last point, however, has the Government offered specific facts to support its concerns. In its reply brief, the Government identified a particular document it now claims is privileged that was inadvertently produced that MTE has now referred to in its response to the Government's motion. (Reply Br. at 5-6.) But MTE filed that document with the Court; it did not place it on its website, and in response to the Government's contention that it is privileged, the Court has ordered it sealed and set a briefing schedule to determine whether it should remain so. The mere possibility that other privileged material may have been provided MTE is too slender a reed upon which to rest an order sealing all discovery materials in the case. Likewise, the fact that much of the material produced in discovery may be irrelevant to the issues in the case is not a ground for ordering MTE not to disclose it. The more MTE fills its online "Litigation Library" with irrelevant documents the less likely it will be that anyone will look to it as a source of information about the case.

The remaining grounds on which the Government rests its argument are stated in conclusory form with no specific reference to the facts of this case in support. If the depositions contain potentially embarrassing and irrelevant information about witnesses' private lives that MTE has no legitimate reason to publish, the Government has not cited it to the Court. From the Court's own review of the depositions submitted, it appears unlikely that anyone would spend his time reading

13

the transcripts or watching the videos unless he was obligated to do so. And as to the fear of jury pool contamination, the same considerations lead the Court to conclude that such fear is unwarranted. It seems unlikely many potential jurors will even know of the existence of the website, or if they do know of it, take the time to explore it. The Court can certainly explore the issue in voir dire and instruct the jury to avoid the website once it is selected. Despite MTE's claim that there is a vital public interest in the case, it has none of the sensationalism that typically generates the kind of public interest that would cause a stampede to MTE's website. The Government has pointed to no evidence of media interest in the case and the Court is not aware of any.

In sum, the Court is unable to find good cause to justify the Government's request for an order directing MTE to remove discovery materials, including deposition videos, from its website. Compare *Stern v. Cosby*, 529 F. Supp. 2d 417 (S.D.N.Y. 2007) (protective order prohibiting the distribution of the video issued where court found release would add to media frenzy over case, interfere with administration of justice, and subject the television journalist deponent to annoyance, embarrassment, oppression, or undue expense or burden); *Hobley v. Chicago Police Commander Burge*, 225 F.R.D. 221 (N.D. Ill. 2004) (holding that order prohibiting public dissemination of video deposition showing testimony in high profile civil police misconduct case which showed witnesses asserting their Fifth Amendment right to decline to answer questions justified by the witness' interests in preserving their constitutional rights). Both the *Stern* and *Hobley* Courts noted that the potential for abuse of discovery materials may be higher with video testimony. *See also Felling*, 2001 WL 1782360 at *3 ("Videotapes are subject to a higher degree of potential abuse than transcripts. They can be cut and spliced and used as 'sound-bites' on the evening news or sports

14

shows.").  Here, however, the Government has not limited its request to videotaped versions of the depositions and has failed to show good cause for the relief it seeks even as to that form of discovery.  Accordingly, that portion of the Government's motion seeking to prohibit MTE from disseminating discovery materials via its website will be denied, as will its motion to seal the deposition transcript of Douglas G. Cox, submitted in support thereof.

## II.  Motion to Quash the Subpoena Compelling the Deposition of Lisa Waukau

The Menominee Indian Tribe, by special appearance, has filed a motion for a protective order requesting that the Court quash a subpoena  issued on behalf of MTE compelling Lisa Waukau to appear for deposition.  MTE argues that it is entitled to question Chairperson Waukau about: (1) allegations she made to a federal investigator that MTE had mismanaged the contracts at issue in this lawsuit; (2) Ms. Waukau's conversations with Douglas Cox, a member of the MTE Board of Directors, regarding the culvert inspections at issue in this case; and (3) Ms. Waukau's conversations with BIA Midwest Region Area Director Larry Morrin, as well as her conversations and coordination with David Congos, in connection with the federal investigation leading to the filing of this case.  (MTE's Mem. Opp. Mot. to Quash 2.)  Characterizing Chairman Waukau as a simple "fact witness," MTE notes that she was not even a member of the Tribal Legislature at the time she was interviewed by a federal investigator as part of the investigation of the case.  Given the wide scope of discovery permitted by Rule 26(b)(1) and Chairperson Waukau's firsthand knowledge of discoverable matters, MTE argues that the Tribe's motion to prevent her deposition should be denied.

15

The Tribe contends that Waukau, as an elected official of the Menominee Tribal Legislature, is not subject to subpoena for deposition regarding information she may or may not have gained in the course of her official duties. (Tribe's Br. Supp. Mot. to Quash ¶ 4.) Waukau has submitted an affidavit in which she indicates that she has been as a member of the Menominee Tribal Legislature, the executive and legislative branch of the Tribe, from February 1995 to February 2003 and from February 2007 to the present, and served as Chairman of the Tribal Legislature from February 2002 to February 2003 and from February 2007 to the present. (Waukau Aff. ¶¶ 4-5.) She also avers that she has no knowledge of, and has taken no action regarding, the activities described in the Complaint except in her official capacity as a member or the Chairman of the Menominee Tribal Legislature. (Id. ¶ 7.)

## A. Procedural Issues

MTE argues as an initial matter that the Court should summarily deny the Tribe's motion because the Tribe has failed to cite any of the four bases that Rule 45 explicitly lists as grounds for such relief and is not timely. Rule 45 states that on timely motion, the court must quash or modify a subpoena that: "(i) fails to allow a reasonable time to comply; (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person . . . ; (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A). The Rule also states that an objection to a subpoena requiring a person to produce documents or tangible things or to permit inspection "must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(c)(2)(B). Because the Tribe did not assert any of the grounds specifically listed in the Rule

16

within the time allowed, MTE argues the Court must deny the Tribe's motion outright. (Br. Opp. Tribe's Mot. for Protective Order at 9.)

MTE's procedural arguments can be quickly dispatched. First, a careful reading of the rule suggests that the 14-day time limit appears only in the section of the Rule governing objections to subpoenas directing a person "to produce documents or other tangible things or to permit inspection . . . ." Fed. R. Civ. P. (c)(2)(B). Thus, it doesn't even appear applicable to a subpoena directing a person to appear for deposition such is at issue here. Fed. R. Civ. P. (c)(3)(A). Assuming, on the other hand, that the time limit does apply, it appears clear that the Tribe complied with it. Tribal Attorney William F. Kussel, Jr., sent MTE's counsel a letter stating the objection of the Tribe and Chairperson Waukau to the subpoena for deposition on the ground of Tribal immunity on February 28, 2008, six days after Chairperson Waukau was served. (Aff. of Joshua Jay Kanassatega, Exs. 6, 7.) MTE's argument that the Tribe's motion is not timely is thus without merit.

The same is true of MTE's argument that witness immunity is not a proper basis for a motion to quash a subpoena and seek a protective order. Rule 45 explicitly allows a person served to move to quash or modify a subpoena if, among other things, the subpoena requires disclosure of privileged or other protected matter or subjects the person served to an undue burden. Rule 45(c)(3)(A). If, as the Tribe contends, Chairperson Waukau is immune from process because of her status as a tribal officer, it clearly follows that the information sought is privileged or otherwise protected and MTE's subpoena is an undue burden. As a practical matter, it is difficult to think of a more appropriate way to raise the issue and provide all parties an effective opportunity to address it without incurring needless expense and effort than the way chosen by the Tribe. The Court

17

therefore rejects MTE's argument that the Tribe's motion is procedurally defective and proceeds to the merits of the Tribe's argument.

### B. Immunity

As a necessary corollary to their sovereignty and self-governance, Indian tribes are immune from suit in both state and federal court unless "Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 754 (1998); *Three Affiliated Tribes of Fort Berthold Reservation v. Wold*, 476 U.S. 877, 890 (1986). Tribal sovereign immunity does not extend to individual members of a tribe just because of their status as members. *Puyallup Tribe, Inc. v. Dep't of Game of State of Washington*, 433 U.S. 165, 172-73 (1977). But it does extend to tribal officials acting within the scope of their authority.[1] *Fletcher v. United States*, 116 F.3d 1315, 1324 (10th Cir. 1997); *Buchanan v. Sokaogon Chippewa Tribe*, 40 F. Supp. 2d 1043, 1048 (E.D. Wis. 1999). Tribal immunity applies to suits for damages, as well as those seeking declaratory or injunctive relief. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978). It has also been found to protect tribes and their officers from legal process such as

---

[1] Tribal immunity also extends to entities that are arms of the tribe, such as MTE. *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 29 (1st Cir. 2000) (" The Authority, as an arm of the Tribe, enjoys the full extent of the Tribe's sovereign immunity."); *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000) ("[T]he College serves as an arm of the tribe and not as a mere business and is thus entitled to tribal sovereign immunity."). While it would seem to follow that MTE is itself immune from suit in the underlying action, a defense MTE has asserted as an affirmative defense but not pursued by motion, the Government contends on the basis of *United States v. Red Lake Band of Chippewa Indians*, 827 F.2d 380, 383 (8th Cir. 1987), that tribal immunity is not a defense in a lawsuit brought by the United States. An even more pressing issue, also asserted by MTE as an affirmative defense but not yet raised by motion, is whether MTE is a person within the meaning of the False Claims Act. *See Vermont Agency of Natural Resources v. United States ex rel Stevens*, 529 U.S. 765 (2000) (holding that False Claims Act does not subject a state or state agency to liability).

18

a subpoena or search warrant. *United States v. James*, 980 F.2d 1314 (9th Cir. 1992) (holding that tribe's Department of Social and Health Services was immune from obligation to respond to defense subpoena seeking records regarding victim's alcohol and drug problems in rape case); *Bishop Paiute Tribe v. County of Inyo,* 275 F.3d 893 (9th Cir. 2002) (holding that tribe's sovereign immunity barred county's execution of warrant to search tribal employee records on reservation as part of a welfare fraud investigation), *vacated and remanded on other grounds*, 538 U.S. 701 (2003). Finally, a tribe's waiver of its sovereign immunity cannot be implied; it must be unequivocally expressed. *Santa Clara Pueblo v. Martinez*, 436 U.S. at 58.

In support of its contention that Chairperson Waukau is immune from MTE's subpoena, the Tribe relies principally on *United States v. James* and *Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 206 F.R.D. 78 (S.D. N.Y. 2002). In *James*, the Ninth Circuit rejected the argument that a waiver of tribal immunity was implicit, let alone explicit, in the grant of federal criminal jurisdiction over tribal members. 980 F.2d at 1319. The *James* Court also held, however, that the Tribe had waived its immunity to records of its Housing Authority related to disturbances resulting from the alleged victim's occupancy of one of its residential units by voluntarily supplying the documents to the Government. *Id.* at 1320 ("The Quinault Indian Nation cannot selectively provide documents and then hide behind a claim of sovereign immunity when the defense requests different documents from the same agency."). Thus, while the Tribe was entitled to withhold documents subpoenaed by the defendant from the Tribe's Department of Health and Social Services relating to the alcohol and drug problem of the alleged rape victim, it could not withhold files maintained by its Housing Authority.

19

In *Catskill Development* a casino development group sued a rival group for tortious interference with their relationship with the St. Regis Mohawk Tribe of Indians. The plaintiffs subpoenaed two members of the Tribe's Gaming Authority who had signed one of the contracts at issue in the case for deposition. The plaintiffs also issued a subpoena to the Executive Director of the Tribe. All three officials moved to quash the subpoenas on the ground of tribal immunity. Analogizing the tribal officers to officers of the United States and relying on the Second Circuit's holding in *United States Environmental Protection Agency v. General Elec. Co.*, 197 F.3d 592 (2d Cir. 1999), that the sovereign immunity of the United States applies to a non-party subpoena issued to a government officer in a civil case, the Court held in *Catskill Development* that tribal officers were similarly immune from nonparty subpoenas in civil actions absent waiver of tribal immunity. The Court concluded, however, that the contract signed by the Tribe included an express waiver of tribal immunity as to disputes arising out of the agreement. The Court thus concluded that the plaintiffs were free to question the two Gaming Authority officials about both Gaming Authority matters and any other matter relevant to the action that did not involve tribal governance. 206 F.R.D. at 90. But because the record did not disclose any involvement of the Executive Director of the Tribe in the Gaming Authority and he did not sign the agreement, the Court upheld his claim of tribal immunity and the subpoena issued to him was quashed. Claiming that Chairperson Waukau's position is more akin to the position of the Executive Director in *Catskill Development* and denying that it took any action that would constitute a waiver of its immunity, the Tribe argues that both *James* and *Catskill Development* support its position that MTE's subpoena should be quashed.

20

The Court is not convinced that the doctrine of tribal immunity is applicable under the circumstances of this case. Unlike *Catskill Development*, this is an action brought by the United States against an arm of a federally recognized Indian tribe. Under *United States v. Red Band of Chippewa Indians,* "[t]ribal sovereign immunity may not be asserted against the United States." 827 F.2d at 383. If the Tribe's immunity could not be asserted against the plaintiff United States in this action, it is difficult to see how it could apply to a discovery request by an arm of the Tribe. Moreover, MTE seeks to depose Waukau in part concerning an interview she gave Special Agent Joseph Schwartz of the Office of Inspector General, Office of Investigations, United States Department of Interior on May 12, 2003. At the time of the interview, Waukau was not a tribal officer. More importantly, it appears that the investigation was at least in part a response to a letter Waukau sent to Midwest Region BIA Area Director Morrin as Tribal Chairperson approximately one year earlier on April 30, 2002. In her letter, Waukau stated:

> As per our conversation today, this is a formal request *from the Menominee Tribe* that we indeed do want a formal review of the Menominee Tribal Enterprise contract performance. Whoever on this end needs to meet with your staff to assist in the development of the Review Plan, *we* stand ready to comply with that request.
>
> I will contact David Congos to begin the coordination effort.

(Kanassatega Decl. Mar. 25, 2008, Ex. 3) (emphasis added). In this Court's view, Waukau's letter to Area Director Morrin, combined with her voluntary interview with S.A. Schwartz, constitutes a waiver of tribal sovereign immunity to the extent any exists under the circumstances of this case. The Tribe may not selectively provide information to the Government and then hide behind a claim of sovereign immunity when the defense requests information concerning the same matter. Having invited the BIA to formally review MTE's performance and cooperated in its investigation, it would

21

be unfair to deprive the defense information of the same kind that the Tribe, or its officials, voluntarily provided the United States. The Court therefore declines to quash MTE's subpoena on the ground of tribal immunity.

### C. Rule 26

The Tribe asserts no other basis for the entry of a protective order preventing MTE from deposing Waukau about these subjects. However, the United States, in support of the Tribe's motion, has asserted that the subpoena should be quashed because MTE has failed to articulate a reasonable basis for questioning Waukau about knowledge of the case. (U.S. Mem. Supp. Mot. to Quash 2.) Waukau clearly has no first-hand knowledge of the facts underlying the Government's allegations against MTE. Whatever information she provided the United States has already been turned over to MTE in the response to its discovery requests. As to the tangential matters MTE has identified in its response to the Tribe's motion, the Government notes that MTE had the opportunity to question Cox and S. A. Schwartz about the substance of their conversations with Waukau, but did not. (Id. 3-5.) It also claims the topics about which MTE seeks to question Waukau are of minimal relevance to this case, and suggests that MTE has served a subpoena on Waukau because of her status as current Tribal Chairman, presumably for improper purposes. (Id.) The United States requests that the Court quash the subpoena under its authority pursuant to Federal Rule of Civil Procedure 26, in order to prevent what the United States claims would constitute abuse of the discovery process.

Indeed, the fact that sovereign immunity has been waived does not necessarily preclude all relief. Rule 26(b)(2) gives the Court ample authority and flexibility to restrict discovery obtainable from a more convenient source, or where the burden of the proposed discovery outweighs its likely

22

benefit, taking into account the relative importance of the proposed discovery in resolving the issues of the case. Furthermore, in spite of the generally broad approach to discovery provided by the Federal Rules of Civil Procedure, when a party seeks to depose a high level government official "special considerations arise." *Pisani v. Westchester County Health Care Corp.*, 2007 WL 107747, *2 (S.D.N.Y. Jan. 16, 2007). "Depositions of high-level governmental officials are permitted . . . upon a showing that: (1) the deposition is necessary in order to obtain relevant information that cannot be obtained from any other source and (2) the deposition would not significantly interfere with the ability of the official to perform his or her governmental duties." *New York v. Oneida Indian Nation*, 2001 WL 1708804, *3 (N.D.N.Y. 2001); *see Gordon v. Housing Authority of Hartford*, 2007 WL 4287470, *2 (D. Conn. 2007) (quashing subpoena for deposition of mayor where neither the mayor nor the city were a party to the action, and mayor was not the only available source of relevant information); *Friedlander v. Roberts*, 2000 WL 1471566, *2 (S.D.N.Y. 2000) ("[S]uch a deposition will not be allowed unless the government official has unique personal knowledge.")

According to MTE, it needs to question Waukau regarding what Cox may have said to her about the culvert inspections, to elicit any recollection she may have of whether Cox told her it was Schwartz or Congos that asked him to conduct the inspections. MTE claims this information would be relevant because, while Cox testified he was told to conduct the inspections by Congos, Congos testified otherwise, raising the key issue of Congos' credibility. (MTE's Mem. Opp. Mot. to Quash 16.) The record, however, does not support MTE's argument. At deposition, Congos testified,

> *I don't recall if I asked Mr. Cox to conduct culvert inspections.* I was aware that Mr. Schwartz wanted him to, and either he asked him— I believe—and my belief is he did, and after he asked Mr. Cox to perform that, I did give him some information about culvert locations. But I did not personally ask him to go and do that work.

23

(Congos Dep. 139:25-140:7, Dec. 11, 2007, Kanassatega Decl. Ex. 9,) (Emphasis added). MTE claims that this apparent discrepancy makes Waukau's version relevant.

But from the quoted excerpt, it appears that Congos' testimony is not in conflict with that of Cox. Although Congos testified that he believed he did not personally ask Cox to perform the inspections, he readily admitted that he did not recall if he did so or not and he acknowledges that he gave Cox some information about culvert locations. Waukau's account of her conversation with Cox, regardless of what she recalls, is simply not proper impeachment, given this record. It certainly does not justify subjecting her to the kind of deposition it would appear from the other depositions it has conducted that MTE envisions.

I also conclude that Waukau should not be required to provide testimony concerning her statements to Schwartz about the history of the contracts at issue. MTE claims that Waukau "is in the best position to testify about what she said and did not say to S.A. Schwartz . . . and what she meant by what she said or implied." (MTE's Mem. Opp. Mot. to Quash 8.) However, MTE clearly has access to Schwartz's record of the interview providing a general description of Waukau's statements, and MTE has not indicated why Waukau's exact statements or any additional "meaning" she meant to assign them are relevant to this case. Furthermore, as the United States notes, MTE made no effort to obtain additional information about the interview from Schwartz, and the general information concerning the Tribal Legislature's actions with regard to the contracts at issue is available from other sources.

MTE also argues that Waukau's communications with Congos and Area Director Morrin may indicate when the Government became aware of the allegedly fraudulent invoices, an issue relevant to both the question of whether the FCA claims are untimely and whether the Government

24

knew they were fraudulent even before they were submitted, thereby vitiating the FCA claims altogether. *See U.S. ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 544-45 (7th Cir. 1999) (holding that the Government's prior knowledge of an allegedly false claim can vitiate a FCA action). But MTE's argument is too undeveloped to warrant permitting the deposition to go forward, at least at this point. Waukau's knowledge, as reflected in S.A. Schwartz' report was limited to general background information far too general to suggest the kind of knowledge needed to trigger a limitations period or vitiate the specific FCA claims asserted in the complaint. Waukau's position is analogous to that of a member of a legislative body who calls for an official investigation into suspicious activity. MTE and the other defendants are entitled to discover the fruits of the investigation conducted in the course of the investigation; they are not entitled on this record to discover the legislature's motivation for seeking it.

Under these circumstances, I conclude that the potential for abuse and risk of the harassment of a high raking tribal official outweigh any potential benefits of subjecting Waukau to questioning regarding her interview. Accordingly, the Tribe's motion for a protective order quashing the subpoena compelling the deposition of Waukau will be granted. In the event MTE makes a more compelling showing as to why Waukau's deposition is required and specifies the nature and relevance of the information she could provide, the Court will reconsider its ruling. For now, however, the Tribe's motion for a protective order is granted.

### III. MTE's Motion to Compel the Production of BIA Invoices, Policies and Procedures

MTE has filed a motion to compel the production of Hazardous Fuels Reduction Program invoices submitted to the BIA Midwest Regional Office ("MRO") by any Indian Tribe or Tribal

Organization, other than the Menominee Tribe, during select time periods between May 2000 and October 2003, along with their supporting documents. (Kanassatega Decl. April 3, 2008, Ex. W.) It also seeks production of all documents illustrating any of the MRO's efforts to explain or enforce what MTE calls "higher reporting and supporting documentation standards" regarding Hazardous Fuels Reduction Program invoices, and all documentation of the MRO's communication with Indian Tribes or Tribal Organizations within its jurisdiction regarding the "then new Forestry Invoice Review and Approval Procedures." (Id.) In addition, MTE requests documents related to the MRO's policies and procedures for Forestry invoice review and approval, and the development of those policies. (Id.)

According to MTE, such "discovery will show that no other Tribe in the region was forced to comply with the retroactive standards and arbitrary and capricious whim of a BIA employee to which [MTE] was held." (MTE's Mem. Supp. Mot to Compel 28.) The BIA employee to which MTE refers is Congos, to whom MTE claims the BIA gave "*carte blanch* to arbitrarily apply his own standards as to what was and was not acceptable work, and to require whatever documentation Congos deemed necessary to support Menominee's invoices." (Id.) MTE claims its invoices were reviewed according to retroactive standards subject to "Congo's whim." (Id.)

Underlying MTE's motion to compel is its claim that the BIA retroactively "changed the rules of the game with respect to Menominee invoices." (Id. at 13.) According to MTE, the BIA ordinarily compensated MTE for its work based upon a showing of the expenses it incurred. However, on February 28, 2002, the BIA implemented a new policy, which it applied retroactively to October 1, 2000. This new policy required a signature certification of the accuracy of an invoice and the submission of a map indicating the location of the work performed. It also authorized MRO

26

Contracting Officers to impose additional reporting and supporting documentation standards. (Id. at 15.) Counsel for defendants Waniger and Pecore explained at the Court's April 15 motion hearing the defendants' perspective that this policy change shifted the measurement of MTE's compensable work from the expenses it incurred to accomplishment maps never previously required for that purpose. The defendants claim that the maps submitted in support of the invoices that now form the basis of the United States' Complaint were submitted in an effort to retroactively comply with these unforseen requirements under the new policy. According to MTE, the policy change allowed the United States to "entrap" it in a False Claims Act claim.

While such claims may be relevant to the issue of whether the defendants knowingly presented false invoices in violation of the False Claims Act, 31 U.S.C. §§ 3729-33, what neither MTE nor the individual defendants have identified is how the invoices submitted by other tribes in the Midwest Region, or the actions and policies of the BIA with respect to the invoices of other tribes, have any relevance whatsoever to the present case. MTE bases its motion on the allegation that the "BIA imposed requirements and standards on Menominee which BIA had not been [sic] promulgated and did not in practice impose on any other Tribe in the region for these programs." (MTE's Mem. Supp. Mot. to Compel 2.) But even if, as MTE asserts, it alone was subject to heightened standards with regard to its invoices, it has made no showing that the BIA was required to treat all tribes alike. According to the United States, it has already provided MTE discovery materials concerning the development of the policies pursuant to which MTE invoices were reviewed. Accordingly, I conclude that the United States should not be required to undertake the burden of producing invoices submitted by other Indian Tribes or Tribal Organizations, or documents concerning the review of such invoices by the BIA. MTE's motion to compel the

27

production of BIA invoices submitted by other tribes, and related invoice review policies and communications will be denied.

**V. Conclusion**

For the reasons set forth above, the United States' motion for a protective order barring MTE's dissemination of discovery materials on its website and its motion to seal the deposition of Douglas Cox are denied. The Tribe's motion to quash the subpoena compelling the deposition of Lisa Waukau is granted, and MTE's motion to compel the production of BIA invoices, invoice review policies, and related documents is denied.

**SO ORDERED** this   30th   day of May, 2008.


s/ William C. Griesbach_____
William C. Griesbach
United States District Judge