**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

UNITED STATES OF AMERICA,

                Plaintiff,                              Case No. 07-C-316

v.

MENOMINEE TRIBAL ENTERPRISES,
MARSHALL PECORE,
and CONRAD WANIGER,

                Defendants.

## DECISION AND ORDER

      The United States brought this action against Menominee Tribal Enterprises ("MTE") and two of its employees. The Government alleges that the Defendants submitted invoices seeking payment that contained false information, in violation of the False Claims Act, 31 U.S.C. § 3729. It further alleges that MTE breached contracts it had with the Bureau of Indian Affairs ("BIA") when it made several large purchases without receiving prior approval. All parties have moved for summary judgment, at least as to some of the claims. For the reasons given herein, I conclude that all claims should be dismissed as to Defendant MTE; False Claims Act claims brought against the individual Defendants will remain.

## I. BACKGROUND

      MTE is the principal business arm of the Menominee Tribe of Wisconsin. The Indian Self-Determination and Education Assistance Act ("ISDEAA") provides that tribes may enter into "self-determination contracts" with the government, whereby the tribes agree to provide services that otherwise would be provided by the federal government. 25 U.S.C. § 450b(j). For more than a

decade, MTE has contracted with the BIA to manage the Menominee Forest and its roads. Its duties under the pertinent agreements included fire prevention (clearing breaks in the forest, maintaining access roads, etc.) and road maintenance.

A number of the jobs MTE performed resulted from proposals it submitted to the BIA. Among these were hazardous fuel reduction ("HFR") and other proposals in which MTE proposed to remove brush, perform controlled burns, and clear and improve fire access roads. (The quality of the access roads is important because fire fighting trucks tend to be large and heavy.) MTE also agreed to create fuel breaks – areas cleared of flammable trees and brush that would slow or stop forest fires. The process of clearing these areas is known as "brushing," and the debris left over from cutting down the trees and brush is known as "slash."

In 2001 MTE submitted a number of invoices to the BIA seeking payment for brushing and road grading. For a number of reasons, BIA employee Dave Congos was concerned that the work described in the invoices either had not been performed or had been performed inadequately. After several attempts to provide supporting documentation, MTE indicated that the invoices would be cancelled and re-submitted. In February 2002, the BIA implemented a new policy governing invoices. Invoices would now require the signature of a responsible tribal official certifying that the invoice accurately reflected the expenditures reflected on the project. (Congos Aff., ¶ 41.) The Defendants contend that the new policy was created with MTE in mind, and in fact they assert that the responsible BIA officials already knew that several of the invoices contained false information. In fact, they note, Congos wrote a memorandum dated February 20, 2002 asking for advice about how to proceed with the "fraudulent billings" MTE had submitted (and would re-submit). (Kanassatega Decl., Ex. E.)

2

A meeting was held on February 26, 2002 in which eight to ten individuals involved in the billing (on both sides) discussed the BIA's problems with MTE's invoices. There is some dispute about whether agreement was reached and what the nature of any agreement was, but the result of the meeting was that several of the offending invoices were returned to MTE to comply with the new certification requirement and to allow MTE to provide more documentation. On March 25, 2002, MTE re-submitted Invoice Nos. 200, 212, 214, 217, 219 and 224, all of which had certifications signed by Defendant Marshall Pecore. These invoices included maps (which the BIA had requested) showing the work performed for each invoice. (Hart Aff., ¶ 17.) For example, Invoice 212 sought payment for brushing performed in May 2001: "19.0 miles @ $450 per mile" for a total of $8,550. (Hart Aff., Ex. A-2.) The invoice included a half-page "narrative" from Defendant Conrad Waniger explaining the work accomplished. It also included a brief description of the time expended on the job: 24 hours on May 5, 2001, and 40 hours on May 12. And as the BIA had requested, the invoice included a map highlighting where the work was performed. Handwritten on the map is the phrase "19 miles brushing."

After the invoices and other documentation were submitted, Congos conducted some fourteen field inspections. (Congos Aff., ¶ 44.) On some of these inspections he was accompanied by another BIA employee, Tom Magnuson. Congos found that some of the roads MTE claimed to have brushed were either not brushed at all or were brushed but not slashed (i.e., the brush was cut but not cleared away), and in the latter case this meant the supposed fire breaks would actually encourage fires rather than stall them (presumably the slash would dry out and become fuel for any fire). Moreover, some of the road grading work for which MTE had sought payment was not accomplished. The Government has created a chart listing the invoices, the amount of work claimed by MTE, and the deficiencies identified by the Government. (Pl. PFOF ¶ 189.) A total of

3

the eight allegedly false invoices and other claims for payment shows a deficiency of roughly 200 miles that were not brushed, as well as 10 culverts that were not installed. Most of the invoices were not paid by the BIA as a result of Congos' inspection. The Government claims that its damages resulting from invoices it did pay amount to $48,205.41.

In addition to the FCA claims, the Government has brought breach of contract claims against MTE. The 1995 road maintenance contract entered into between the United States and MTE contained a clause requiring pre-approval of expenditures exceeding $5,000:

> The Contracting Officer must approve in writing leases of any dollar amount, all equipment purchases estimated at $5,000.00 or over and all subcontracts estimated at $5,000.00 or over. The Contractor will submit a written request for approval giving the estimated amount and the name and address of the lessor, vendor or subcontractor proposed along with a justification of need. Failure to obtain this required approval will result in disallowance of the cost of the lease, purchase or subcontract.

(Mani Aff., Ex. A, Section H-7.)

Similarly, the 2000 road maintenance contract incorporated a provision from an OMB circular that required pre-approval of certain capital expenditures. According to the United States, MTE made a number of equipment purchases without obtaining pre-approval, even though MTE was specifically notified of that requirement. For example, in 1999 MTE spent some $218,000 on a road grading machine, $67,000 on a backhoe, and $25,000 for a Chevrolet pickup truck. In 2000 MTE bought a $77,000 snowplow truck and spent $253,000 building an equipment garage.

In addition to incurring these unapproved equipment expenses, the United States alleges MTE breached its contracts by transferring funds the BIA had provided for indirect costs to the general fund it used for direct costs. These transfers allegedly occurred in October 2000 and April 2001. Further, the Government alleges that MTE breached its contracts by charging the Government for equipment usage, when in fact MTE had actually purchased the equipment in

4

question with BIA funds in the first place. The governing OMB circular allows equipment use costs to be charged in some cases, but not if the equipment was already purchased with government funds. The United States alleges that some $78,554 was improperly charged for equipment use costs. Other facts are set forth below, where relevant.

## II. MOTIONS FOR JUDGMENT ON THE PLEADINGS

MTE and the individual defendants have moved for judgment on the pleadings. They all argue that they were not "persons," as defined in the FCA. As such, they contend, all FCA claims must be dismissed against them. A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is similar to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). A court should grant the motion "[o]nly when it appears beyond a doubt that the plaintiff cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved." *Moss v. Martin,* 473 F.3d 694, 698 (7th Cir. 2007).

### A. The Tribe is not a "Person" under 31 U.S.C. § 3279

The False Claims Act establishes civil penalties for "[a]ny person" who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval," or who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(1), (3). The Tribe's motion for judgment on the pleadings is based on its argument that it is not a "person" that may be sued under the False Claims Act.[1]

---

[1]The Tribe also argues that its sovereign immunity precludes this lawsuit. Immunity is a question of subject matter jurisdiction, an issue that is typically reached before the merits of the lawsuit. In *Stevens,* however, the Supreme Court found it preferable to reach the question of statutory interpretation first. *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 780 (2000). That is the approach I follow here.

5

The FCA provides no definition of "person" in that context, and courts have interpreted the term based on the FCA's history and purpose. In *United States ex rel. Chandler v. Cook County, Ill.*, for example, the Supreme Court found that counties and municipalities were "persons" subject to suit under the Act. 538 U.S. 119, 132 (2003). Three years earlier, the Supreme Court found that states were *not* "persons" under § 3729. *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 780-781 (2000). Courts have never had occasion to consider whether an Indian tribe is a "person" under the FCA, and thus much of the dispute in the present case boils down to which of these two recent Supreme Court cases more accurately sets forth the proper considerations applicable to Indian tribes.

The question in *Chandler* was whether Cook County, Illinois, was a "person" within the meaning of 31 U.S.C. § 3729. The Court began its analysis with a lengthy history of how the term "person" was interpreted in 1863 when the FCA was enacted. 538 U.S. at 125. It noted that private corporations were certainly deemed "persons" at that time, as corporations were collections of individual persons. Essentially, corporations were considered "artificial persons." *Id.* at 126. The Court went on to find that municipalities were also persons: "municipal corporations and private ones were simply two species of 'body politic and corporate,' treated alike in terms of their legal status as persons capable of suing and being sued." 538 U.S. at 126. Thus, given that municipalities were always capable of being sued and were considered "persons" when the FCA was drafted, the Court found no reason to exclude Cook County from the FCA's reach.

In contrast, in *Stevens* the Court found the FCA inapplicable to states. In reaching its conclusion, the Court cited a number of factors. First, it began with the presumption that the term "person" does not include the sovereign. 529 U.S. at 780. The Court then noted that since its enactment in 1863, none of the FCA's numerous amendments had broadened the definition of

6

"person" beyond the original understanding. Further, in another, unrelated provision, the statute defined person to include states. The fact that such a definition was absent in § 3729 suggests Congress intended to exclude states. The Court also noted that the FCA was essentially punitive in nature, and courts should generally be reluctant to apply punitive provisions to governmental entities. *Id.* at 785. Moreover, the Program Fraud Civil Remedies Act of 1986, which embodied a "sister scheme" of the FCA, contains a definition of "person" that excludes states. It would not make sense, the court found, for Congress to exclude states in one statute while including it in another. "In sum, we believe that various features of the FCA, both as originally enacted and as amended, far from providing the requisite affirmative indications that the term 'person' included States for purposes of qui tam liability, indicate quite the contrary." *Id.* at 787.

Given these divergent precedents, the ultimate question is whether Indian tribes have more in common with states or with municipalities. I first note that many of the concerns set forth in *Stevens* are inapposite here. For example, the Court turned to other parts of the statute and another statute altogether to infer that states were excluded from § 3729. Those inferences were based on those provisions' clear applicability (and inapplicability) to states in particular. Yet the applicability of those provisions is not at all clear where tribes are concerned, and so it is impossible to draw any meaningful inferences by looking outside of § 3729 itself.

The *Stevens* court also noted that the FCA's remedial scheme was essentially punitive, and it relied partly on a presumption that states should not be subject to punitive measures absent clear Congressional intent to the contrary. One might think that a similar presumption against applying a punitive statute to the Tribe would hold, but the Court in *Chandler* found that local governments were amenable to suit under the FCA. The concern against sticking taxpayers with quasi-punitive damages was of "limited vigor" because local taxpayers may be indirect beneficiaries of the fraud

7

and the federal government would be entitled to recoup its losses on behalf of all U.S. taxpayers. *Cook County, Ill. v. U.S. ex rel. Chandler,* 538 U.S. 119, 132 (2003). The same, presumably, may be said with respect to Indian tribes.

But although these concerns do not apply to the present case, I am satisfied that the reasoning of *Stevens* applies with equal force to Indian tribes and that *Chandler* did not overrule any aspect of *Stevens*' holding. As the Tribe notes, *Chandler's* unanimous holding was based on a thorough analysis of the meaning of "person" as it was understood in 1863, when the FCA was enacted. The Court concluded that at that time "municipal corporations and private ones were simply two species of 'body politic and corporate,' treated alike in terms of their legal status as persons capable of suing and being sued." 538 U.S. at 126. There is no such common understanding in this case – Indian tribes, with sovereign immunity, certainly cannot be sued in the same fashion as counties or cities. Thus, *Chandler* does not alter the landscape; it merely recognized that counties have always been subject to suit, and as such there is no reason to exclude them from the definition of "persons" under the FCA.

Although a number of factors were at play in *Stevens* and *Chandler,* there is no question that the difference in outcomes was motivated chiefly by the fact that states enjoy sovereign immunity while municipalities do not. Although the immunity question does not conclusively answer the question of what the statute means (i.e., whether a tribe is a "person" under 31 U.S.C. § 3729(a)), the existence of immunity is what drives a key statutory interpretation *presumption*. The holding of the *Stevens* court reiterated the presumption that the term "person" does not include the sovereign, the upshot of which is that before a sovereign can be sued there must be some "affirmative indications" of Congress' intent to abrogate immunity. "In sum, we believe that various features of the FCA, both as originally enacted and as amended, far from providing the

8

requisite affirmative indications that the term "person" included States for purposes of qui tam liability, indicate quite the contrary." *Id.* at 787.

In explaining the holding in its *Chandler* opinion, the Seventh Circuit recognized the same principle:

> Given the sovereign status of states, Congress must do something more to bring states within the coverage of a federal law than enact a law aimed at "persons," even if that term is used in its broadest sense. The same is not true of municipal corporations and other governmental bodies within state boundaries.

*United States ex rel. Chandler v. Cook County, Ill.,* 277 F.3d 969, 975 (7th Cir. 2002), aff'd 538 U.S. 119. And just as Congress "must do something more" to indicate that a sovereign state may be sued, it must do so if it intends a sovereign tribe to be sued. Because *Stevens* turned largely on the statutory presumption afforded sovereign entities, and because there is no affirmative evidence that Congress intended to allow Indian tribes to be sued under the FCA, I conclude tribes are not "persons" under § 3729(a).[2]

Nor am I persuaded by the Government's argument that the outcome should be different here in light of the fact that the United States, rather than a private party, is the plaintiff. The United States suggests that while *Stevens* applies when private individuals sue states (or tribes), the presumptions used by the majority are inapplicable when the government itself is the plaintiff. It is true that the protections of sovereign immunity do not generally apply when the United States

---

[2]I further note that tribes are even deemed part of the United States for purposes of the Federal Tort Claims Act. *Hinsley v. Standing Rock Child Protective Services,* 516 F.3d 668, 672 (8th Cir. 2008) ("Tort claims against tribes, tribal organizations, or their employees, that arise out of the tribe or tribal organization carrying out a self-determination contract, are considered claims against the United States and are covered to the full extent of the FTCA.")

9

is suing another sovereign, but in the FCA context a private *qui tam* party is actually suing on behalf of the United States. The FCA allows private parties to sue, but they are standing in the shoes of the government and acting as private attorneys general. "The United States remains the real party in interest in a qui tam suit brought under the FCA, while the 'private attorneys general,' or 'relators,' benefit from the action by sharing with the government in the monetary recovery of the lawsuit." *Stalley v. Methodist Healthcare,* 517 F.3d 911, 917 (6th Cir. 2008); *United States ex rel. Walker v. R&F Properties of Lack County, Inc.,* 433 F.3d 1349, 1359 (11th Cir. 2005) ("The United States is the real party in interest in a qui tam action under the False Claims Act even if it is not controlling the litigation.") A private FCA action must be brought in the name of the United States, 31 U.S.C. § 3730(b)(1), and even when the Government does not intervene the case cannot be dismissed without its consent.

The point is that private litigants in FCA lawsuits are actually acting on behalf of the United States, and the United States is represented whether it is the originator of the lawsuit or just a bystander. As such, the considerations of sovereign immunity expressed in *Stevens* would apply with almost equal force regardless of whether the United States is the *named* plaintiff (represented by the attorney general) or whether it is represented by a *qui tam* relator (a "private" attorney general). Thus, there is little reason to limit *Stevens* to lawsuits in which a private citizen is the plaintiff: either way, the United States the real party in interest.

In addition, the Court in *Stevens* was construing the statutory term "person" as it is used in the FCA. The meaning of a specific term in a statute does not change depending on who the plaintiff is. Although a concurrence in *Stevens* suggested the question was left open by the majority's opinion, that sentiment was not echoed by five members of the majority. 529 U.S. at 789. And although at least a few unpublished district court opinions would seem to allow an FCA

10

lawsuit by the United States against a state entity, neither of these cases – nor the United States –

has explained how the definition of a specific word in a statute could change based upon who is on

the left side of the "v" in the caption.[3]  In other words, *Stevens* construed the term "person," and in

doing so it did not limit its analysis to the sovereign immunity issue, nor did it intend that the

definition could change based on the identity of the plaintiff.  Although the dissent and

concurrences would disagree with the majority or at least keep the question open, I do not read the

majority opinion as narrowly as the United States does.

**B. Defendants Pecore and Waniger are "Persons" under § 3729(a)**

Defendants Pecore and Waniger have filed their own motion for judgment on the pleadings.

They assert that if the Tribe is not a "person," then they cannot be "persons" either because they

were acting in their official capacity and in the scope of their employment.

The Ninth Circuit has recently held that "state officials, sued for damages in their individual

capacities, are 'persons' within the meaning of 31 U.S.C. § 3729."  *Stoner v. Santa Clara County

Office of Educ.*, 502 F.3d 1116, 1125 (9th Cir. 2007).  The considerations of sovereignty that apply

in the consideration of whether a state is a "person" do not apply merely because the individuals

sued are state employees:

> The individual defendants challenge this straightforward conclusion by contending
> that it permits an end-run around *Stevens* and the Eleventh Amendment.  They argue
> that a relator precluded from asserting a qui tam action against a state agency could
> bring the same action against individual state employees in their personal capacity.
> We find this argument unpersuasive.  An individual capacity suit for damages
> against state officials alleged to have personally violated § 3729 does not implicate
> the principles of state sovereignty protected by *Stevens* and our Eleventh
> Amendment jurisprudence because such an action seeks damages from the

---

[3]*United States ex rel. Chittister v. Department of Cmty. and Econ. Dev.,* No. 1:CV-99-2057
(M.D. Pa., Sept. 23, 2002) (Dkt. # 208); *United States v. University Hosp. at Stony Brook,* 2001 WL
1548797 (E.D.N.Y. 2001).

individual defendants rather than the state treasury. Nor does the fact that a state may choose to indemnify the employees for any judgment rendered against them bring the Eleventh Amendment into play. As the Supreme Court explained, "the distinction between official-capacity suits and personal-capacity suits is more than 'a mere pleading device.'" Where a plaintiff seeks to hold individual employees personally liable for their knowing participation in the submission of false or fraudulent claims to the United States government, the state is not the real party in interest, and the Eleventh Amendment poses no barrier to such a suit.

*Id.* (citations omitted).

Defendants Pecore and Waniger suggest that they were acting in their "official capacity" when they undertook the actions cited in the complaint, and such a suit against them is really a suit against the Tribe. There is some support for their argument. In *United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa,* 269 F.3d 932, 935 (8th Cir. 2001), the Eighth Circuit concluded that a lawsuit against a state administrator was essentially a lawsuit against the state. The complaint alleged that the individual defendant had administered a state program in a fashion that defrauded the federal government, and the court concluded that the lawsuit was brought against the defendant in his official capacity, i.e., a suit against the state itself. As such, it was barred by *Stevens*.

The *Gaudineer* case was subject to a dissent, and its approach was rejected by the Ninth Circuit in *Stoner*. (The *Stoner* petition for certiorari was denied by the Supreme Court on October 6, 2008.) For the reasons suggested by the Ninth Circuit, I conclude that the considerations set forth in *Stevens* and other cases do not extend to the individual employees of states and other sovereign entities unless those employees are actually sued in their official capacities.

Importantly, it is not up to the defendants to decide how the claims should be styled. Instead, the course of proceedings (e.g., the nature of the recovery sought) is what determines whether the lawsuit is brought against defendants in their individual or official capacity. *Brandon v. Holt,* 469 U.S. 464, 469 (1985). When the United States names in its complaint *both* individual

12

defendants and the Tribe itself, and when it insists in its briefs that it seeks relief against the individuals *as* individuals, it should be clear enough that it is not suing the individuals merely as stand-ins for the Tribe itself. *United States ex rel. Adrian v. Regents of University of California,* 363 F.3d 398, 403 (5th Cir. 2004).

In sum, this is not a lawsuit brought against individuals in their "official capacities," it is a lawsuit brought against individuals who happen to be Tribal employees. It is no different than the legions of § 1983 claims that are brought against state officials in their individual capacities, the vast majority of which involve state employees (prison guards, police officers, zoning administrators, et al.) acting within the scope of their employment. Recovery against these Defendants is not tantamount to recovery against the Tribe, and a judgment against these individuals would not in any way impact the sovereignty of the Tribe itself. It is clear that the individual defendants are "persons" within the meaning of § 3729, and the United States has not sued these defendants in their official capacity. Accordingly, the FCA claims against the individual defendants will not be dismissed.

## III. MOTIONS FOR PARTIAL SUMMARY JUDGMENT

The United States, MTE, and the individual defendants have all filed motions for partial summary judgment. Summary judgment is proper only when the materials before the court demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When the parties have filed cross-motions for summary judgment, "we construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Samuelson v. LaPorte, Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008).

13

## A. Pecore's and Waniger's Motion for Summary Judgment on FCA Claims

I have concluded that MTE itself is not a "person" under the FCA, which renders its motion for summary judgment on the FCA claims moot. I have concluded, however, that individual Defendants Pecore and Waniger are "persons" under the statute. They present several arguments seeking dismissal of the FCA claims.

An FCA claim requires proof of three elements: (1) presentment to a government officer or employee; (2) a false claim; and (3) knowledge of its falsity. 31 U.S.C. § 3729(a)(1). *United States ex rel. Fowler v. Caremark RX, L.L.C.,* 496 F.3d 730, 740 (7th Cir. 2007).

## 1. That "Actual Expenses" Were Owed does not Insulate Defendants from Liability

One of the principal themes of the defense is that the relevant agreements stipulated that MTE would be reimbursed for its actual expenses. MTE, the Defendants argue, actually *did* incur the expenses for which it billed. For example, even if a given invoice listed 19 miles of brushing work when only 15 miles was performed, MTE's actual expenses were exactly what was invoiced. Even though the number of *miles* billed was wrong, the bottom line was correct. Because MTE was entitled to be paid its actual expenses (i.e., it could recover its bottom line), it follows that the actual miles claimed on the invoices were immaterial to the government's decision to pay.

But MTE's interpretation of the agreements is not supported by the record. Most obviously, it was clear that the Government was always interested in the number of miles that were cleared rather than simply the number of hours worked or expenses incurred. Why would the BIA request maps of completed work (and why would MTE provide them) if that information was "immaterial"? And why would Congos go on multiple inspections of the work sites if all the Government cared about were MTE's hours worked or "actual" expenses? In fact, the entire relationship of the parties makes no sense if the only thing that mattered was MTE's actual

14

expenses. Obviously, the Government (like any customer) was concerned with *how much work* MTE was doing. The contracts were not a blank check under which MTE could bill for anything it wanted. It actually had to do work, and MTE knew that.

Moreover, the premise underlying the Defendants' argument is something of a red herring. The Defendants' overarching theory is that (a) MTE's employees actually worked the number of hours they claimed and incurred the actual expenses MTE claimed and (b) the Government owed actual expenses anyway, so the actual number of miles listed on the invoices was immaterial. But even if the agreements may have been based on actual expenses (regardless of work done), and even if MTE actually incurred the bottom line expenses for which it sought reimbursement, that does not mean MTE had a blank check to draft invoices for phoney miles. Suppose (to take an extreme example) MTE actually incurred $1 million in expenses to clear 100 feet of brush. In doing so, it paid its employees at a rate of $10,000 per hour. Yet, recognizing that it has spent an exorbitant amount of money to do very little brushing work, MTE decides to invoice the Government for 1,000 miles of brushing instead of the mere 100 feet its employees actually cleared. That way, the false invoice disguises *how* the money was spent, even though the money *was* actually spent (albeit frivolously) on road clearing. Would MTE be justified in this approach? Of course not. The fact that they believed their actual expenses were to be reimbursed does not entitle MTE employees or anyone else to submit claims for payment that deliberately mislead the Government as to *how* those expenses were incurred.

Similarly, the fact that the invoices may have disclosed the correct number of hours worked does not mean the invoices were not false. The direct effect of overstating the number of miles cut was an increase in the apparent efficiency of the project. Just as a contractor might want to mask the rates it paid its employees for labor, it might also want to give the impression that it did more

15

work than it actually did.  Remarkably, the Defendants chide the Government for its "stubborn insistence on inspecting whether certain roads were completely brushed" because that information is "immaterial to whether the invoices were false." (Dkt. # 214 at 12.)  Of course this is a preposterous objection.  The logical extension of the Defendants' argument is that they would have been within their rights to submit invoices for thousands of miles of bogus work, so long as the bottom line they sought reflected actually incurred expenses.  MTE did not have a blank check to make up information about the amount of work it did just because it was otherwise entitled to be paid for its expenses.[4]

But of course much of this is beside the point.  Regardless of whether the governing contracts provided actual expenses, the FCA does not view false claims in the narrow fashion the Defendants suggest.  That is, the statute is not concerned with the particular details of what a given contract may have provided, it is concerned with preventing a party from submitting a false claim, which is "*any* request or demand, *whether under contract or otherwise*, for money . . ." 31 U.S.C. § 3729(c).  Even if MTE were truly entitled to be compensated for its "actual expenses" under the governing agreements, it is the specific invoices here – the requests for payment – that count as false claims.  The key question is whether the false information was material to the Government's decision to pay those claims. *United States ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.,* 400 F.3d 428, 443 (6th Cir. 2005).  Although the governing contracts could play a role in the materiality analysis, it is clear that there is substantial evidence that the amount of miles

---

[4]Of course it should be obvious that MTE was not entitled to be paid for whatever expenses it incurred *just because* it incurred them.  Its employees knew the BIA was concerned the whole time with how much work was actually being accomplished.  Why else would Congos have performed so many inspections?  MTE has not identified any other similar contract where the billing party was entitled to be paid from the Government for any expense it incurred, regardless of how it performed the work in question.

16

brushed or graded was a key consideration (i.e., material) in the Government's decision to pay or not pay the claims, and this factor was not necessarily linked to any specific contractual provisions.

Ultimately, regardless of what the Defendants may have believed about their obligations under the relevant contracts, for FCA purposes the question is whether they submitted a claim for payment that contained false information material to the Government's decision to pay. Their supposed entitlement to "actual expenses" does not mean their allegedly false submissions were not false claims.

## 2. The Government's "Knowledge" of Falsity is not a Defense

The Defendants argue that the Government knew certain of the invoices were "false" before they were even presented. In particular, they assert that as of February 2002, David Congos knew MTE's invoices 212, 214, 217, 219 and 224 contained false information. These invoices were returned to MTE. On February 28, the BIA adopted a new policy requiring submissions to certify that the invoice and supporting data were "accurate and complete." This policy was adopted with MTE's invoices in mind. Congos and others hoped the new certification policy would cause MTE to either correct its submissions or to not file them at all. That did not materialize, however. When MTE did re-submit the offending invoices, which contained the same false information, MTE argues the BIA was already on notice that they were false. In fact, MTE argues that in a February 26 meeting Congos led MTE to believe that the invoice issues were "resolved" and the invoices would be paid if they were resubmitted.

MTE relies on *United States ex rel. Durcholz v. FKW Inc.,* 189 F.3d 542 (7th Cir. 1999). But that case does not hold that advance Government knowledge of falsity somehow renders that invoice true or insulates the defendant from liability. In *Durcholz* , a government agency needed a contract performed quickly. In order to fast-track the process, Government officials instructed

17

bidders to bid using excavation line-items in their bids when in fact everyone knew the project was expected to be a dredging project. An invoice was submitted by the winning bidder using the excavation line-items, even though excavation was not done. When a government accountant later flagged the problem, the contractor resubmitted the invoice by eliminating the offending line-items. After the bidder was paid, one of the losing bidders brought an FCA action alleging the proposals and invoices were false claims because they used excavation line-items when in fact the project was a dredging project.

In affirming the district court, the Seventh Circuit noted that "[i]f the Government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA." *Id* . at 545. But this statement of the law is not as broad as MTE suggests. It is not merely government *knowledge* of falsity that precludes an FCA claim, but government *encouragement* and *involvement* in the submission of those claims. As the Seventh Circuit observed:

> From the start,[government] officials were more interested in speed than cost and made their decisions in accordance with these priorities. They classified the project as a performance specification in order to expedite the bidding, knowing that the UPB did not contain dredging line-items. They later directed FKW to modify its proposal to match the Midwest bid and told FKW to resubmit its invoices without the excavation line-items. Thus, the government not only knew that FKW's proposal and invoices contained excavation line-items, it directed FKW to use those pricing numbers. *In essence, then, Durcholz is alleging that the government was defrauded by the very activities that its agents ordered*.

*Id.*

Under such unique circumstances, it would be impossible to claim the Government was defrauded by the very actions it orchestrated. This narrow exception is not applicable here. Even

18

if Congos and other BIA officials suspected certain of MTE's invoices were false, they did not encourage or order the BIA officials to resubmit the invoices with that false data. It was not their idea to submit invoices with false amounts of work performed. In fact, according to MTE itself, the new certification rule was implemented specifically with a view towards *discouraging* MTE from submitting the invoices with the false data. (MTE PFOF ¶ 23.) In short, even if the BIA officials suspected or knew certain information was false, that does not preclude applicability of the FCA.

**3. "Falsity" of the Claims Based on "Performance" Issues or Contract Disputes**

Defendants argue that many of the Government's falsity contentions are based on the quality of MTE's work in performing the contract. The HFR proposals, they note, did not contain any concrete standards for performing the work. And throughout the contracting process the Defendants allege they were confused as to what the Government's invoicing expectations were. Thus, this case is only about (they allege) disputes about contracts and their performance rather than any issues involving "false" claims.

The Government protests that its claims relate to work either not done at all or for work that was woefully incomplete because slash was not removed. In other words, it is not quibbling about performance or seeking to enforce some idiosyncratic interpretation of the contracts; it is alleging the work in question was either not done at all or done in a fashion that no one could plausibly claim the work was satisfactory.

I conclude that the Government's FCA claims are not simply contract disputes about performance or interpretation. As to the work not done at all, there is no dispute that failure to do work claimed would be a false claim. And as to the Government's claims based on areas that were cut but not slashed, the Defendants have not even suggested that such work would constitute

19

adequate brushing under any performance standard. In other words, there was no reasonable "interpretation" of the contracts that would have allowed the Defendants to leave slashed brush on the ground and then bill the Government for that work as though it were completed. The Government is not suing the Defendants for failure to live up to a given standard or for failure to perform adequately. Its claims are based on a complete lack of performance that would fail under any standard. It is apparent that the United States believes there were countless discrepancies in MTE's work, but for pragmatic reasons it has focused its effort to show false claims only on the most glaring omissions in MTE's invoices. Accordingly, none of the Government's claims turns on any interpretation of the contract requirements or any issues of adequate performance.

## 4. Laches

Finally, the Defendants argue that the doctrine of laches precludes the Government from pursuing this case. The invoice submissions occurred five or six years before this case was brought, and Pecore and Waniger argue that it is difficult to find necessary evidence to defend against the Government's accusations (despite their own recent production of large amounts of new evidence). In particular, if the Court rejects their principal contention (discussed above) that the amount of work done was immaterial, then the number of miles worked is a key issue in the case. By the time the Government filed suit in April 2007, it was impossible to reconstruct the evidence necessary to show how much work they actually did.

The laches defense "'requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Pruitt v. City of Chicago, Illinois,* 472 F.3d 925, 927 (7th Cir. 2006) (citations omitted). The United States notes at the outset that application of the doctrine of laches is highly controversial when the United States itself is the plaintiff. One idea is that when the government is acting on behalf of its citizens (here, to recover

20

allegedly fraudulently paid funds and return them to the taxpayer), laches (an equitable doctrine) has little applicability. Another suggestion is that "only the most egregious instances of laches can be used to abate a government suit." *United States v. Administrative Enterprises, Inc.,* 46 F.3d 670, 673 (7th Cir. 1995). Laches might come into play, for example, if a defendant's due process would be violated by prosecution of a stale civil lawsuit.

But regardless of whether laches may *ever* be a defense against the Government, it is clear that it would only be applied in an unusual case. This is not such a case. The FCA contains a six-year statute of limitations, 31 U.S.C. § 3731(b), and the Defendants concede that the Government filed suit within that time period. At the outset, therefore, it is difficult to conclude that there was an "unreasonable" delay when the Government brought suit within the statutorily allotted time period. Moreover, the lawsuit was the result of a lengthy federal investigation. The Government did not sit on its hands for five years and then dig a dusty file out of a cabinet. There was, in short, no unreasonable delay in bringing suit.

In addition, I note that much of the key evidence involves work that was documented at the time of the invoice submissions. BIA officials toured the areas extensively and concluded the work had not been done. Pictures were taken. Although some of the evidence is no doubt lost (the Defendants cite the death of an important witness), there are always going to be evidentiary problems arising from a five-year delay. That is accounted for by the statute of limitations itself, and this is not the sort of case that cries out to have the equitable defense of laches trump the Congressionally provided limitations period.[5]

---

[5]Pecore and Waniger also move for summary judgment on the question of whether they were acting within the scope of their employment. This argument is largely a rehash of the arguments they raised in their motion for judgment on the pleadings. There is nothing within the FCA that insulates individuals from liability merely because they were acting within the scope of

**B. The United States' Motion for Summary Judgment on the FCA Claims against Pecore and Waniger**

The United States has also moved for summary judgment on the FCA claims. To reiterate, an FCA claim requires proof of three elements: (1) presentment to a government officer or employee; (2) a false claim; and (3) knowledge of its falsity. 31 U.S.C. § 3729(a)(1). *United States ex rel. Fowler v. Caremark RX, L.L.C.,* 496 F.3d 730, 740 (7th Cir. 2007). The first two elements were discussed at length above. In short, the Government believes the evidence shows that MTE's employees submitted invoices that contained false information about the amount of work done. Further, the Government argues that MTE's employees created and used false records and falsely certified every quarter that its funds were being used for the purposes for which they were intended. It has chiefly relied on eight invoices that overstated the amount of brushing and grading work MTE accomplished.

The falsity of these claims is a highly fact-intensive analysis, but even assuming the evidence is as conclusive as the Government believes, it is clear that knowledge of the falsity is where the Government's motion must fail. Under the FCA, A person acts "knowingly" if he:

> (1) has actual knowledge of the information;
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
> (3) acts in reckless disregard of the truth or falsity of the information,

31 U.S.C. § 3729(b). The statute also provides that "no proof of specific intent to defraud is required." *Id.*

---

their employment – presumably *most* FCA defendants are. They also suggest the issue has resonance with respect to their cross-claims against MTE, but they have not moved for summary judgment on their cross-claims and MTE has not responded. Accordingly, the issue is not an appropriate one for summary judgment.

22

The Government argues that Pecore and Waniger acted in reckless disregard of the truth or falsity of the information because they submitted invoices without taking any reasonable steps to verify the information contained therein. Waniger was MTE's fire management officer, and Pecore was the forest manager. Surely it was within their ability to easily verify that the invoices were accurate.

The Government relies on two cases for the general proposition that one cannot bury his head in the sand and then claim he did not know the submissions were false. In *United States v. Krizek,* for example, a psychiatrist and his wife billed Medicare for bogus claims. 111 F.3d 934, 936 (D.C. 1997). The wife, who was in charge of billing, never made any effort to verify the amount of time her husband spent with his patients. On some days, she submitted bills totaling almost twenty-four hours, a fact which should have jumped out at any careful biller. And in *United States v. Mackby*, a physical therapy clinic billed the government using the PIN of a physician who was the father of the clinic's owner. 261 F.3d 821 (9th Cir. 2001). The defendant argued that he was not personally responsible for the fraud, but the court rejected that approach on the theory that any reasonable person in his shoes would have known what was going on. These cases demonstrate the principle (reflected in the statute itself) that a specific *mens rea* for fraud is not required. Instead, it is enough that bills are submitted with reckless disregard for their truth. Importantly, however, in both of these cases judgment was entered only after a bench trial. The cases do not stand for the proposition that a court could find the requisite level of knowledge at the summary judgment stage.

My review of the record suggests that the Government's case is a strong one. It has maps and other submissions that it believes its evidence will show to be false. The individuals responsible for submitting the invoices were in an excellent position to either know they were false

23

or to be reckless in not verifying their accuracy. On the other hand, there was clearly some significant give and take regarding the invoices at issue here. The Defendants would argue that they believed they were complying with what the BIA wanted. Moreover, it was obvious by the time the invoices were re-submitted that the BIA had significant veracity issues. To re-submit the invoices with false information after knowing the BIA was concerned about their truth could have been either brazen or wholly innocent, and that is a determination that cannot be made on summary judgment. In addition, there is no allegation that either of the Defendants personally profited from the fraud (unlike *Krizek* or *Mackby*). Although personal profit is not an element of an FCA case, it could at least suggest the mistake was an innocent one rather than one made with reckless disregard for the truth. These latter points may be undercut by the fact that the FCA does not require a specific intent to defraud, but they at least call into question the reckless disregard issue. The point is that I cannot conclude on summary judgment that the facts mandate judgment in the Government's favor. Accordingly, its motion will be denied.

## C. Motions for Summary Judgment on the Contract Claims

MTE has also moved for summary judgment on the common law claims the Government has brought against it; for its part, the Government has moved for summary judgment on its contract claim but not its other common law claims. MTE argues that the Contract Disputes Act precludes jurisdiction over all of these claims. It also raises other arguments – some in support of its own motion and others in opposition to the Government's. In particular, it argues that the statute of limitations provided in the Indian Self-Determination and Education Assistance Act is only one year, which means the current contract claims are time-barred.

24

**1. The Contracts Disputes Act does not Divest the Court of Jurisdiction**

Federal district courts generally have jurisdiction over cases whenever the United States is the plaintiff. 28 U.S.C. § 1345. MTE argues, however, that this court lacks jurisdiction over the contract claims because the Contract Disputes Act ("CDA") applies to the contracts at issue. Under 41 U.S.C. § 605(a), "[a]ll claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer." That means, MTE argues, that a federal district court is not the proper venue for this "claim by the government against a contractor." *Id. See McDonnell Douglas Corp. v. United States*, 754 F.2d 365, 370 (Fed. Cir.1985) ("the evident purpose of Congress when it enacted the [CDA] ... [was] to centralize the adjudication of government contract disputes" in the contracting officer, the board and the Claims Court").

The Government concedes that the CDA applies to the contracts at issue, and it further concedes that courts have interpreted the CDA to generally preclude the Government from filing contract claims in federal district court. Most of the dispute on this issue involves what both sides agree is an exception to the general rule. The last sentence of § 605(a) provides that "[t]his section shall not authorize any agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud." As the Government notes, courts interpreting this exception have generally done so broadly, principally because the statute itself refers to claims "involving" fraud, which suggests the exception is meant to allow the Government to sue in district court whenever fraud is at issue, even if the claim itself is not "for" fraud. *United States v. Unified Industries,* 929 F. Supp. 947, 950-51 (E. D. Va. 1996). Thus, in *Unified Industries,* the court found that breach of contract and unjust enrichment claims constitute claims "involving fraud" because "the same set of operative facts alleged here gives rise to the contract and unjust enrichment claims, as well as to the FCA claims." *Id.* at 951. Similarly, in *United States v. Rockwell Int'l Corp.,* the Government brought

25

both FCA claims and common law claims against a defendant. 795 F. Supp. 1131 (N.D. Ga. 1992). The defendant moved to dismiss the government's common law claims on the basis that those claims did not require proof of the elements of fraud, but the court rejected that argument on the grounds that the "involving fraud" exception was quite broad. "[N]umerous district courts have confirmed that common law claims, such as those asserted in the instant case, which arise from fact situations also involving the FCA, are 'claims involving fraud' and jurisdiction of the district court is not barred by the CDA." *Id.* at 1135 (reviewing cases).

Here, the FCA claims clearly "involve" fraud. The FCA claims assert that the Defendants knowingly submitted invoices for work that was not performed and used false records to do so. The Government further alleges that MTE misused funds advanced by the BIA by not seeking the approval that MTE knew was required. The common law claims allege not merely run-of-the-mill contract performance issues but issues of knowing receipt, misuse and misappropriation of government funds. The motivation behind some of these acts, the Government alleges, was the fact that MTE had used up substantial contract resources on its unauthorized purchases, which resulted in MTE's need to submit false billings to the Government. It is clear enough that the common law claims do not allege fraud, per se, but they certainly "involve" the Government's allegation that MTE defrauded the Government by submitting false billings and using false records.

The fact that the FCA claims are being dismissed against MTE because MTE is not a "person" under the FCA does not detract from the nature of the actions the United States has alleged.[6] And of course the FCA claims remain against the individual Defendants. Accordingly,

---

[6]MTE suggests that the Government's pleadings are some sort of effort to elude the CDA's jurisdictional bar, but it offers no reason why the Government would be harmed in any way by having a contracting officer hear the dispute rather than a district court. *Unified Industries,* 928 F. Supp. at 961 ("No significant risk exists that the Government, as part of a plan to maintain a breach

26

because the contract claims "involve" fraud, I find that the CDA does not bar this court from considering counts III, IV, and V.

**2. Breach of Contract Claim**: **Statute of Limitations**

MTE argues that a one-year statute of limitations applies to the Government's contract claims. Because the alleged breaches of contract occurred in 1999, 2000 and 2001, MTE argues the contract claims are time-barred.

The source of MTE's argument is the ISDEAA, 25 U.S.C. § 450j-1(f). That provision states:

> (f) Limitation on remedies relating to cost disallowances
>
> Any right of action or other remedy (other than those relating to a criminal offense) relating to any disallowance of costs shall be barred unless the Secretary has given notice of any such disallowance within three hundred and sixty-five days of receiving any required annual single agency audit report . . . . Such notice shall set forth the right of appeal and hearing to the board of contract appeals pursuant to section 450m-1 of this title. For the purpose of determining the 365-day period specified in this paragraph, an audit report shall be deemed to have been received on the date of actual receipt by the Secretary, if, within 60 days after receiving the report, the Secretary does not give notice of a determination by the Secretary to reject the single-agency report as insufficient due to noncompliance with chapter 75 of Title 31, or noncompliance with any other applicable law.

25 U.S.C. § 450j-1(f).

I begin by noting that this provision has apparently never been interpreted or applied by a court, at least in a published opinion. MTE argues that this provision applies because the Government's breach of contract action is "any right of action . . . relating to any disallowance of costs." It notes that the clause is clearly drafted in broad terms ("any action . . . relating to"), and the Government's common law claims, at their essence, are based on the disallowance of certain

---

of government contract claim in federal district court, would attempt to avoid the exclusivity provision of the CDA by alleging fraudulent activity in relation to the contract dispute.")

27

costs, i.e., those purchases for which MTE did not gain preapproval and those funds which it allegedly misused.

The Government argues that "disallowance of costs" in the § 450j context is "a specific phrase" synonymous with an administrative determination by the Secretary "to reject the single-agency report as insufficient due to noncompliance with chapter 75 of Title 31 [the Single Audit Act], or noncompliance with any other applicable law." (United States Consol. Reply Br. at 19.) The United States' argument is difficult to follow. The Government apparently equates the "notice of any such disallowance" the statute requires with the Secretary's "notice of a determination . . . to reject the single audit report as insufficient due to noncompliance with [the Single Audit Act]."

The principal problem with this approach is that a cost disallowance and a rejection of an annual audit report for noncompliance with the Single Audit Act are two different things. The Single Audit Act governs the filing of annual audit reports from federal grant and contract recipients. For example, the statute requires:

> Each single audit conducted pursuant to subsection (a) for any fiscal year shall--
> (1) cover the operations of the entire non-Federal entity; or
> (2) at the option of such non-Federal entity such audit shall include a series of audits that cover departments, agencies, and other organizational units which expended or otherwise administered Federal awards during such fiscal year provided that each such audit shall encompass the financial statements and schedule of expenditures of Federal awards for each such department, agency, and organizational unit, which shall be considered to be a non-Federal entity.
> (e) The auditor shall--
> (1) determine whether the financial statements are presented fairly in all material respects in conformity with generally accepted accounting principles;
> (2) determine whether the schedule of expenditures of Federal awards is presented fairly in all material respects in relation to the financial statements taken as a whole;
> (3) with respect to internal controls pertaining to the compliance requirements for each major program--
> (A) obtain an understanding of such internal controls;
> (B) assess control risk; and

(C) perform tests of controls unless the controls are deemed to be ineffective; and (4) determine whether the non-Federal entity has complied with the provisions of laws, regulations, and contracts or grants pertaining to Federal awards that have a direct and material effect on each major program.

31 U.S.C. § 7502.

MTE submitted the required annual audit reports in 1999, 2000, 2001 and 2002. (Tchida Decl., Exs. G-J.) These are three-page computerized documents filled out by an independent auditor. Each report breaks down the amounts MTE expended by program. For example, the 1999 report indicates expenditures totaling some $2.36 million: $454,386 for road maintenance; $1,578,366 for forest and fire management; and $327,539 for forest development. (*Id.*, Ex. G.) None of these reports were rejected as being in noncompliance with the Single Audit Act, 31 U.S.C. § 7501, *et seq.* All of United States' breach of contract damages stem from the expenses set forth in these audit reports.

The provisions of the Single Audit Act have nothing to do with cost disallowances, however. A cost disallowance could result from, for example, an unauthorized expense that required pre-approval (as here). In fact, that is what the 1995 Roads Contract actually says: "failure to obtain this required approval will result in disallowance of the cost of the lease, purchase or subcontract." (Cook Decl., Ex. A at H-7.) It is clear that the bulk of the Government's common law claims are in essence an action to enforce a disallowance. It should also be clear that a rejection of an annual audit report for noncompliance with the provisions of the Single Audit Act is a rejection of an *audit report* – it is not a *disallowance* of any costs. Because cost disallowances are different from rejections of audit reports, it seems clear that the ISDEAA's statute of limitations is not limited, as the Government argues, only to instances where the Government rejects an audit report.

29

Instead, the statute's terms are reasonably straightforward. The Government has one year to give notice of a cost disallowance or else "any right of action or other remedy . . . relating to any disallowance of costs shall be barred." 25 U.S.C. § 450j-1(f). The issue of the audit reports only arises in calculating *when* that year begins running: a disallowance is barred "unless the Secretary has given notice of any such disallowance within three hundred and sixty-five days of receiving any required annual single agency audit report." This is sensible enough: the Secretary has a year from receiving the annual audit report to give notice of disallowance of any costs.

Moreover, the issue of the Secretary rejecting an audit report only relates to when the Secretary is deemed to have "received" the audit report: "For the purpose of determining the 365-day period specified in this paragraph, an audit report shall be deemed to have been received on the date of actual receipt by the Secretary, if, within 60 days after receiving the report, the Secretary does not give notice of a determination by the Secretary to reject the single-agency report as insufficient due to noncompliance with" the Single Audit Act, 31 U.S.C. § 7501 *et seq*. This simply means that if the Secretary does not reject the annual audit report within 60 days, the date of his actual receipt will be the date that triggers the 365-day limitations period. Thus, the rejection of an audit report only comes into play in calculating when the statute of limitations period begins ("[f]or the purpose of determining the 365-day period specified in this paragraph . . . ") – it does not somehow limit the *substantive* scope of the limitations provision. That limitation provision is undeniably broad, as it contains not one but two expansive qualifiers ("relating to" and "any"). It applies to bar "[*a]ny* right of action or other remedy. . . *relating* to *any* disallowance of costs." When the Government's case is based on recovering costs it believes should have been disallowed, it is clearly an action "relating to any disallowance of costs."

30

The Government also seeks to limit the scope of the statute of limitations by noting that the specific expenditures it complains of (e.g., the road grader MTE purchased in 1999) were not set forth by line item in the annual audit reports. (Response to MTE's Supp. PFOF, ¶ 7.) The Government further notes that § 7503 of the Single Audit Act provides that "[t]he provisions of this chapter do not limit the authority of Federal agencies to conduct, or arrange for the conduct of, audits and evaluations of Federal awards, nor limit the authority of any Federal agency Inspector General or other Federal official." Here, the inspector general conducted an audit, as allowed by § 7503. This case arises not out of any of the specific information contained in the annual audit reports but the subsequent audit the BIA conducted.

Yet the United States has not identified any requirement that specific expenses should be itemized in an annual audit report. The report forms themselves do not provide for this, and nothing in the statute suggests that such detail is required. More importantly, there is nothing in 25 U.S.C. § 450j-1(f) that limits the one-year limitations period only to claims for disallowances of expenses that are *itemized* in an annual audit report. Instead, as noted, the statute broadly applies to actions "relating to any disallowance of costs." Had Congress wanted to narrowly limit the statute of limitations in the fashion the Government suggests, it could have written the statute to apply to "any disallowance of costs arising out of expenses itemized in an annual audit report." Instead, it wrote the statute extremely broadly. The only reasonable reading of the entire provision is that any claims relating to disallowances of costs must be filed within a year after the Government receives the annual audit report governing that reporting period. Because the United States never filed any notices of disallowance relating to the claims at issue here, its common law claims are time barred.

31

## IV. OTHER MOTIONS

In addition to the motions for judgment on the pleadings and for summary judgment, the parties have filed a number of other motions. The United States has filed a motion to exclude certain witnesses and their affidavits, on the grounds that these individuals were not disclosed until after the discovery deadline. Earlier, the Government filed a motion to strike the Defendants' amended Rule 26 disclosures. This latter motion was addressed in a July 9 hearing. In both motions the United States alleges that the Defendants have offered significant amounts of evidence at a very late stage in these proceedings.

I note that in ruling on the dispositive motions addressed above, I did not rely on any of the disputed evidence. Counsel will appear for a status conference to discuss the future scheduling of this case and a trial, if necessary. At that time the Government may renew its request for any relief that may be appropriate, including additional discovery. For now, however, the motions are denied without prejudice.

## V. CONCLUSION

For the reasons given above, MTE's motion for judgment on the pleadings is GRANTED, and the other Defendants' motion for judgment on the pleadings is DENIED. The United States' motion for summary judgment is DENIED. MTE's motion for summary judgment is GRANTED in part, and all claims against Defendant MTE are DISMISSED. The other Defendants' motions for summary judgment are DENIED. FCA claims against the individual Defendants remain.

**SO ORDERED** this ____15th____ day of January, 2009.

                              s/ William C. Griesbach_____
                              Honorable William C. Griesbach
                              United States District Judge