UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                                         Case No. 07-C-316

v.

MENOMINEE TRIBAL ENTERPRISES,
MARSHALL PECORE,
and CONRAD WANIGER,

       Defendants.

**DECISION AND ORDER**

      A jury returned a verdict in favor of Defendants Pecore and Waniger in this False Claims Act action brought by the United States.[1] Defendants now move for attorney's fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A). For the reasons given below, I conclude that the government's case was substantially justified and that a fee award would be inappropriate.

**I. EAJA Standard for Awarding Fees**

      For a fee award to be justified, it is not enough that the government lost its case. The EAJA provides that a court "shall award to a prevailing party other than the United States fees and other expenses . . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." *Id.* Although the "substantially justified" qualifier gives up the certainty that would be afforded by a clearer rule, it allows courts to award

---

[1]The factual background underlying this action is set forth in numerous previous decisions.

fees in those cases where the government's case was so weak that it would be unjust to require the defendant to foot the bill for his defense. The Seventh Circuit has explained the analysis as follows:

> A position is substantially justified if it has a reasonable basis in law and fact. The government has the burden of establishing that its position was substantially justified, and to do so must show: (1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory propounded; and (3) a reasonable connection between the facts alleged and the theory propounded. EAJA fees may be awarded if the government's pre-litigation conduct . . . or its litigation position are not substantially justified, but the district court is to make only one determination for the entire civil action.

*Conrad v. Barnhart,* 434 F.3d 987, 990 (7th Cir. 2006).

As just noted, in determining whether fees are appropriately awarded, a court is to make "only one determination for the entire civil action." *Id*. That suggests that a court must take a broad, *gestalt* approach rather than a narrow, line-by-line analysis of the record. Even so, the court does not examine the entirety of the case. Instead, the only "relevant 'position' of the government is that which corresponds to the claim or aspect of the case on which the private party prevailed." *Jacobs v. Schiffer,* 204 F.3d 259, 264 (D.C. Cir. 2000).

What all this means is that a few isolated missteps by the government – especially in a drawn-out imbroglio like this case – would not be enough to hang a fee award on. By contrast, if the government engaged in a pattern of misconduct or based the fundamentals of its case on incorrect law or shoddy factual development, a fee award could indeed be justified. Ultimately, the factors cited by the Seventh Circuit in the "substantially justified" analysis must be viewed in light of EAJA's purpose, which is "to remove the deterrent effect of having to pay attorney's fees to defend against unreasonable government action." *SEC v. Zahareas*, 374 F.3d 624, 630 (8th Cir. 2004). "The case must have sufficient merit to negate an inference that the government was coming

2

down on its small opponent in a careless and oppressive fashion." *United States v. Thouvenot, Wade & Moerschen, Inc.,* 596 F.3d 378, 381-82 (7th Cir. 2010).

**II. Analysis**

    **A. The Defendants' Arguments**

Defendants cite several grounds supporting their claim that the government's position was not substantially justified, and I will address each of their arguments below, keeping in mind that the burden is on the government to meet the EAJA standard.

    **1. Failure to Follow Official Policies**

First, the Defendants argue that the government failed to follow its own regulations before filing this lawsuit. Specifically, Bureau of Indian Affairs policy manuals provide that the BIA should establish a dialogue with an Indian tribe before instituting federal action. (Reynolds Decl., Ex. M.) According to Defendants, the BIA should have notified the Tribe that it was considering bringing this lawsuit and it should have asked the Tribe for input and informed it about the implications of such a lawsuit. Had the government engaged in this less formal initial approach, the Defendants argue, some of the misunderstandings about the work they performed would have been cleared up. In addition, Defendants renew their argument that this case was primarily a matter of contract performance rather than false claims. As such, the government should have used the administrative contract procedures governed by the Indian Self-Determination Education and Assistance Act before bringing this dispute to court in a False Claims action.

This argument is weakened, however, by the fact that BIA policy manuals do not have the force of law or regulation. They are useful guides, perhaps, and indeed I could conceivably consider the failure to follow internal policies as evidence of the government's potential bad faith

3

or some sort of improper agenda. But the cases Defendants cite rely on agency violations of laws and regulations, and such violations are absent here. Additionally, it was not as though the government's lawsuit here was a precipitous rush to the courthouse. The violations alleged occurred long before this action was brought, and this action was itself brought *in lieu* of criminal proceedings after lengthy investigations and discussions within the government. Finally, it is unclear how an alleged failure to follow policies directing the BIA to consult with tribal officials would have much weight when what's at issue now is the case brought against these *individual* defendants. Ultimately, they are individual citizens who happened to have worked for Menominee Tribal Enterprises. Their employment gave rise to their ability to interact with the government and created the window of opportunity to submit allegedly false claims, but apart from that there seems little reason to look to intergovernmental dispute resolution policies when the case (at this stage) involves only private citizens. Accordingly, I do not place much weight on the government's alleged failure to follow its own policies in bringing this lawsuit.

**2. Failure to Investigate**

Defendants also argue that the government failed to adequately investigate the factual basis for this lawsuit. This argument cites numerous factors that, in the Defendants' view, should have tipped the government off that its case was groundless. First, they argue that the government's key witness, David Congos, improperly deemed various road clearing work "not done" and then proceeded to deem bills associated with those roads to be "false" because the work had not been completed to his satisfaction. The Defendants were not billing based on how many miles of road they cleared but on what their expenses were. Because they were billing on a cost basis rather than a per-mile basis, the invoices submitted by the Defendants were not "false" because they accurately

4

reflected their actual expenses. In addition, the government's reliance on MTE's maps was flawed because MTE never intended the maps to show where work was done on a miles-completed basis.

This line of argument is not new. Defendants have argued throughout this action that they were never claiming to have billed for work on a per-mile basis. As such, an invoice seeking payment for "5 miles" of brushing was not actually a statement that MTE employees had completely brushed 5 miles. Although the jury evidently subscribed to this theory at least in part, it does not change the fact that some of the invoices actually submitted by MTE billed on a per-mile basis. They claimed to have established a given number of miles of fuel breaks, and when Congos inspected the fuel breaks he concluded that they were not completed. Clearly, there was ample confusion about the method MTE was using for billing, and the jury could have concluded that the confusion undermined the government's argument that MTE was deliberately submitting false claims. But that dispute does not itself undermine the government's justification for pursuing the case. As I noted at the summary judgment stage, even if the Defendants' expense-based view of its billing was entirely correct, that did not entitle it to list areas of work done (by mileage) if those areas were not actually done. (Dkt. # 257 at 15.) It is obvious that the government actors were actually misled and confused about MTE's requests for payment: why else would they conduct so many meetings on the subject, engage in correspondence with tribal officials, and conduct on-site investigations of what they thought MTE was claiming? In short, even though the Defendants prevailed at trial, I am satisfied that the government's basis for bringing this lawsuit arose out of the confusing nature of MTE's billing practices rather than any untoward exercise of federal power. The fact remains that government employees used the invoices and maps the Defendants submitted and concluded that work claimed in those documents had not been done.

5

Much of the Defendants' objection to the government's pre-litigation approach arises out of the government's alleged failure to undertake a thorough factual investigation of the roads allegedly not brushed and graded and the culverts allegedly not installed. The Defendants' own expert inspected the roads and found thousands of stumps cut that could be dated to the time the work should have been done (nearly a decade prior to trial). Defendants provided visual evidence that all but one of the contested culverts had actually been installed, and roads that Congos deemed "not graded" were actually graded in many parts. Instead of conducting a new investigation, however, the government relied largely on Congos' own field inspections of the work site from many years earlier. The Defendants argue that a thorough pre-litigation investigation would have revealed that much of the work had actually been done and that the invoices the Defendants submitted were not actually false. Moreover, they believe the government appeared to avoid interviewing the individuals who actually did the work, and it was unmoved by the time sheets and work logs that these individuals submitted to show they had done the work in question.

Any time the government loses a case, the prevailing defendants can claim that the government failed to spend enough time and effort investigating. The argument is particularly weak in a case like this, which involves questions as to whether certain trees were cut and roads were cleared nearly a decade before the trial occurred. The government relied primarily upon Congos' inspections, which were done soon after the BIA received the invoices in question. The fact that the Defendants conducted a more recent investigation does not impose some kind of duty on the government to do the same. It could reasonably have concluded that the contemporaneous inspections were the best evidence of fraud, and it could further have concluded that the various sites could have been cleared or cut in the intervening years, which would muddle the evidence and create even more factually complex issues.

6

Moreover, it is noteworthy that this Court allowed the Defendants to produce its inspections-based evidence despite the fact that its expert's inspections occurred after the close of discovery. The government vehemently opposed the addition of this new evidence and characterized the Defendants' late disclosures as "flagrant violations of Fed. R. Civ. P. 26." (Dkt. # 337 at 2.) Although I allowed the Defendants' late-disclosed evidence to be admitted, this was more an act of leniency in an effort to ensure a full record and protect the Defendants themselves from the arguably deficient performance of their attorney. The government's opposition to the evidence was sound, and it was based partly on its position that it had all the evidence it needed, which had not been contested by Defendants' expert until the eve of trial. The Defendants' current objection that the *government* should have conducted a more thorough investigation thus rings distinctly hollow given their own conduct during discovery: if the Defendants themselves did not conduct an on-site investigation until so late in these proceedings, why should the government have done so when it already had Congos' field inspections from years earlier?

Additionally, the Defendants complain that the government failed to investigate its belief that they committed fraud when they had other MTE employees falsify their time cards to reflect fire-related forestry work. The jury evidently rejected the government's fraud theory at trial, and had it investigated more prior to trial (the Defendants argue) it would not have made the time card fraud the "centerpiece" of its case.

Once again, however, the government called witnesses who testified that they actually falsified their time cards. Even the Defendants admit that their explanation for the time card falsification was "potentially confusing" – and it is unclear how the government is supposed to respond differently in the face of what it viewed as doctored records. (Dkt. # 383 at 30.) The fact that the jury may have sided with the Defendants does not mean the government was off-base in

7

pursuing this line of argument or in failing to investigate every possible explanation for the discrepancies.

Finally, Defendants also contend that the government's theory of fraud morphed over the seven year course of these proceedings. Principally, the Defendants believe it was clear from the outset that the government actors had no idea how MTE was actually billing for its work. This led to various and divergent claims of fraud for the same invoices – sometimes the government alleged (for example) eight miles worth of fraud, and other times it was twelve miles, all based on the same documents MTE submitted. These changing theories of fraud show, the Defendants believe, that the government never really had a handle on how it was actually defrauded, which means its decision to bring this action was not substantially justified.

But that, of course, is really a microcosm of this entire case. At trial it became clear that a number of different actors were operating under a variety of different assumptions and expectations. The government may have changed its various assessments of *how much* fraud there had been, but from the very beginning it was clear that the government actors were convinced they were being billed for work that was not being done. That its view of the scope of fraud changed over time does not mean the government should not have pursued a False Claims Act action at all.

### 3. Motive

In my view, the Defendants' strongest argument is that the government essentially failed to show a convincing motive explaining "why two good men would risk going to jail for lying on invoices when they received no benefit." (Dkt. # 371 at 15.) There was never any credible evidence that either Waniger or Pecore stood to gain financially from submitting false claims, and thus the idea that they would have repeatedly tried to defraud the government was always a difficult proposition to take to a jury.

8

Even though I view this as a reasonably strong argument, however, it actually does very little to call into question the government's justification for pursuing the lawsuit. First, the government did have a motive theory. Based on the testimony of MTE employees, the government argued that the Defendants were attempting to draw down BIA funding for fire prevention and use those funds for more typical forestry operations. Even if the jury did not ultimately believe that theory, it was not as though the government's theory came out of left field.

Second, the False Claims Act does not require a motive to defraud. *United States ex rel. Durcholz v. FKW Inc.,* 189 F.3d 542, 544 (7th Cir. 1999) ("The *mens rea* element, 'knowingly,' requires that the defendant have actual knowledge of (or deliberately ignore or act in reckless disregard of) the truth or falsity of the information presented.") Although naturally it helps any case to have a concrete motive (e.g., personal financial gain), the government was merely required to prove that the Defendants had knowledge that their submissions to the government were false.

Finally, the Defendants' notion of motive is too narrow. They protest that the Defendants are good men who did not stand to gain financially from the fraud. But personal financial gain can come in many forms, and it is not limited to the case where the defendant specifically pockets the proceeds of his false government claim. Employees, to some extent, stand in the same shoes as their employer. If business is good, employees benefit; if funding dries up, they (or their subordinates) could find themselves out of work. Presumably there are countless employees in the workforce who are complicit in their employers' illicit behavior (shielding income from taxes or dodging regulations, for example) even though they do not specifically profit from that activity. It is implicitly part of the job, which might not exist but for the illegality, and that can be motive enough. Here, the government evidently believed that the Defendants were aiding their employer in drawing down BIA funds to supplement their other operations; the simple fact that the

9

Defendants did not pocket the fruits of the alleged fraud does not mean that they had absolutely no motive to falsify documents on behalf of their employer.

### 4. Contract Dispute Versus False Claim

A final objection from the Defendants is also a familiar one. Defendants have objected throughout this case that the action is more similar to a contract dispute than anything involving a false claim. They argue that much of the government's case depended on its belief that work was done inadequately or improperly rather than not done at all. As such, the government's gripe was more about contract performance than about any false claims.

It should go without saying that the fact that the case involved contract performance does not necessarily foreclose False Claims Act liability. Part of the government's argument was that some of the fire prevention work done was so shoddy (e.g., leaving cut brush on fire break roads) that the work done actually made the forest *more* susceptible to fires. Certainly there is a point at which the quality of one's performance under a contract is so substandard that it cannot legitimately be called performance at all, and in such cases an invoice based on substandard performance may rightly be considered "false."

In *United States ex rel. Davis v. Dyna Corp.,* for example, the government alleged that a contractor "knowingly furnished splints that did not comply with the contract requirements and did not conform to Dyna's own drawings, specifications, standards, and quality assurance practices." 1994 WL 48316, *1 (9th Cir. 1994). There, although the government lost its case, the district court denied attorney's fees on the ground that the government's case was substantially justified. The applicable contract provided that "Metal parts shall be free from burrs, pits, corrosion, dirt, grease, foreign matter or other imperfections. Cloth and foam components shall be free from cuts, tears,

10

ravels, dirt, grease, foreign material, or other defects." *Id.* The government actually had evidence that significant quantities of metal parts it received contained cracks, i.e., "other imperfections."

> The government interviewed several former Dyna employees . . . A number of these former employees stated that the powdered metal parts were subject to cracking, and that they repeatedly failed when tested. The government also conducted its own tests of the splints. An inspection of 66 unused Hare Traction Splints which Dyna had delivered under its contract revealed that 12 of the splints had cracked locking wheels. In the investigator's opinion, these cracks constituted a major defect in the splints. He concluded that 21% of the sample he examined were defective, far in excess of the "[n]ormal acceptable limits" of "1% for major and 2.5% for minor defects.

*Id.* at 2.

In *Dyna* the question of contract performance was whether the shipped metal parts had imperfections in them, and the answer to that question was based (as here) on the government's own inspections and assessment of quality. Such questions naturally involve judgment calls about the adequacy of the contractor's performance, but that does not remove the case entirely from the purview of the False Claims Act. Just as there were imperfections in the parts shipped in *Dyna,* here there were imperfections in the work done by MTE's employees. Although some aspects of the case did resemble an action for breach of contract, that does not foreclose liability under the False Claims Act.

In sum, there is no doubt that the government's case was a difficult one. It was attempting to show fraud based on the actions of MTE employees nearly a decade earlier against a backdrop of confusing billing practices and divergent expectations on all sides. But I am satisfied that none of the arguments now raised by the Defendants undermines the essential component of good faith that is crucial to my conclusion that the government's action was substantially justified.

11

### C. The Government's Case <u>Was</u> Substantially Justified

I concluded above that the Defendants' arguments do not strongly support their position that the government's claims were not substantially justified. In addition, an independent reason supports my conclusion that the government's case was substantially justified. Specifically, "there is a presumption that a government case strong enough to survive both a motion to dismiss and a motion for summary judgment is substantially justified." *Thouvenot,* 596 F.3d at 382. Though the parties do not discuss this presumption, it was the centerpiece of a recent case the Seventh Circuit consolidated for decision to address the "substantially justified" question at issue here. *Id.* There, the government had lost its case alleging that a project engineer's design of an apartment building violated the Fair Housing Act. The Seventh Circuit noted that a trial can reveal that the government had no case at all, or that the judge had erred in his prior rulings. But otherwise the presumption stands: if the government gets to trial after defeating a summary judgment motion, it should generally be found to have been substantially justified in its position.

The *Thouvenot* court found that the district judge had placed far too much weight on the fact that the government lost at trial and it found that the judge should have considered his earlier rulings in determining whether the government's case was substantially justified:

> In deciding to award fees the district judge gave no weight to his rulings denying TWM's motions for summary judgment, for judgment as a matter of law at the close of the government's evidence, and for judgment as a matter of law at the close of all the evidence. After hearing all the evidence he had decided that the government had a substantial case and therefore the jury would be permitted to decide it, and the only thing that happened afterward was that the jury rendered a verdict for TWM. This impelled the judge to review the evidence after the defendant filed its motion for an award of attorneys' fees. But all he found in his review, judging from his cryptic discussion, was that the jury's verdict was justified by the evidence, which no one questions. He pointed to nothing that suggested that the trial had revealed profound weaknesses in the government's case that, had he known about them earlier, would have moved him to grant one of TWM's dispositive motions.

*Id.*

12

Here, I denied the Defendants' motion for summary judgment. (Dkt. # 257 at 14-21.) In that opinion I concluded, among other things, that there were serious questions about the Defendants' argument that they were entitled to be paid for actual expenses rather than miles worked. And even if that were true, I observed, that would not necessarily entitle them to submit invoices with false mileage on them. At trial, I also denied the Defendants' motion for dismissal at the close of the government's case. (Dkt. # 340 at 5.) I further declined to direct a verdict in the Defendants' favor at the close of all the evidence. (*Id.* at 8.) These latter rulings (the latter motion I took under advisement rather than denying it outright) reflected my view at the time that the government had presented enough evidence to allow a jury to rule in its favor. In short, after a nearly two-week trial, I was not prepared to take the matter out of the jury's hands, and this strongly suggests that the government had at least a reasonable basis for bringing and litigating this case to verdict. And when the jury began its deliberations, I did not have a strong opinion either way about what the result would be. In short, this case is no different than *Thouvenot*. The facts adduced at trial did not cause me to question any of my earlier rulings in favor of the government, and I repeatedly held that its case should be decided by a jury. The government had a case, and reasonable jurors could have come out the other way. Accordingly, I fail to see how I could conclude that the government's case was not substantially justified.

### D. Requests to Admit

Defendants also argue that they are entitled to attorney's fees under Rule 37(c)(2), which provides that if an answering party fails to admit a fact or principle that is later proven at trial, the requesting party is entitled to the reasonable expenses and fees he incurred in proving that fact. Naturally, Rule 37 does not mandate fees merely because a party proves at trial what his opponent failed to admit; the failure to admit does not give rise to fees so long as the party has a "reasonable

13

ground to believe that it might prevail on the matter." Fed. R. Civ. P. 37(c)(2)(C). In arguing that the government lacked a "reasonable ground," Defendants reiterate many of the arguments they raised in arguing that the government's position was not substantially justified.

Defendants cite two categories of requests that the government should have admitted. The first category involves requests such as Request 21, which involved Invoice 200: "As of March 22, 2001, hazardous fuel expense totaling at least $8,707.50 had been incurred by MTE for work performed pursuant to the applicable HFR proposals." The government responded by denying knowledge sufficient to admit or deny the assertion, and it noted that "the United States cannot determine if MTE incurred legitimate hazardous fuels expenses for work actually performed within the appropriate scope of the applicable HFR proposals." (Dkt. # 371 at 27-28.) Defendants served several similar requests, and all received the same response from the government.

The United States was well within its rights in refusing to admit such requests. Defendants argue that the amounts billed were all based on records and invoices in the possession of the government, and the accuracy of these records was never contested. But that is not all the requests ask. The requests state that the expenses were incurred "for work performed pursuant to the applicable HFR proposals," and that is essentially this case's key dispute in a nutshell. The government's position was that any work MTE did was *not* done pursuant to the applicable proposals – it was either not done at all, it was not fire prevention work, or it was done in a substandard fashion. By couching the requests to admit in such language, the Defendants were not merely asking the government to stipulate to an undisputed fact, they were asking the government to concede the essence of its case. (Not surprisingly, the government's response questioned whether MTE had incurred "legitimate hazardous fuels expenses.")

14

The same holds true for the other category of requests cited by the Defendants. They asked the government to admit (for example) that "the work indicated on invoice 200 (with supporting attachments) had been substantially performed by MTE by March 14, 2002." (Dkt. # 371 at 28.) Once again, the Defendants were not asking its opponent to stipulate to noncontroversial fact or assertion, they were asking the government to concede that work had been "substantially performed," which would imply that billing for the work would not constitute fraud. The mere fact that the Defendants prevailed at trial does not mean the government should have stipulated to such assertions earlier. The "true test under Rule 37(c) is not whether a party prevailed at trial but whether he acted reasonably in believing that he might prevail." *Mutual Service Ins. Co. v. Frit Industries, Inc.,* 358 F.3d 1312, 1326 (11th Cir. 2004) (quoting Fed. R. Civ. P. 37(c) advisory committee's note to 1970 amendment.) Accordingly, I conclude that the government did not improperly fail to admit the assertions proposed by Defendants. For the same reasons, I conclude that it did not improperly fail to supplement its admissions in the face of the evidence provided by Defendants during summary judgment and in advance of trial.

An additional reason causes me to reject the Defendants' fee request. Fees are justified under Rule 37 only when a matter is proved "true" at trial. In its verdict, the jury concluded that the government had failed to prove the alleged violations of the False Claims Act, 31 U.S.C. § 3729(a), and Defendants assume this means they proved the assertions contained in their requests to admit. But the jury verdict in the Defendants' favor does not specifically speak to the matters set forth in Defendants' requests. The government was required to prove a number of elements to establish the violations, including *mens rea,* and the jury could easily have based its verdict on the government's failure to prove that the Defendants acted "knowingly." If so, the jury's verdict would not necessarily mean that the work was, in fact, "substantially done," it would mean simply

15

that the Defendants did not *knowingly* submit a false claim. In other words, the jury could have believed that the claims *were* actually false, but that the Defendants did not know they were false. Because the jury's verdict did not turn on accepting as true the matters set forth in the requests to admit, I cannot conclude that those requests were ever proved "true" under Rule 37(c)(2). Accordingly, even if the United States should have admitted the requests at issue here and supplemented its disclosures, Rule 37(c)(2) is not triggered.

### III. Conclusion

Above I have concluded that the Defendants are not entitled to attorney's fees under the EAJA or Rule 37. Such a conclusion is not to say that it is fair that the Defendants are required to bear the substantial costs and attorneys fees they incurred in their defense against claims for which the jury found they were not liable. But this "unfairness" is the product of the American Rule under which each side in a legal dispute is generally required to bear its own attorneys fees even though it is exonerated, as occurred here. *E.E.O.C. v. O & G Spring & Wire Forms Speciality Co.*, 38 F.3d 872, 881 (7th Cir.1994). The EAJA and Rule 37(c) are exceptions to the American Rule, but they apply only in limited circumstances that I found lacking here. The motion for attorney's fees is therefore **DENIED**.

**SO ORDERED** this     15th     day of June, 2010.

     s/ William C. Griesbach
     William C. Griesbach
     United States District Judge